*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0406**

In the Matter of the Welfare
of the Children of:
A.D., Parent

**Filed August 3, 2015
Affirmed
Chutich, Judge**

Ramsey County District Court
File Nos. 62-JV-14-1418, 62-JV-14-1419, 62-JV-14-2152,
62-FA-11-535, 62-FA-11-2648; 62-DA-FA-13-661

Nicole S. Gronneberg, St. Paul, Minnesota (for appellant A.D.)

John J. Choi, Ramsey County Attorney, Stephen P. McLaughlin, Assistant County Attorney, St. Paul, Minnesota (for respondent Ramsey County Community Human Services Department)

John Jerabek, St. Paul, Minnesota (for respondent guardian ad litem Chuck Oesterlein)

J.F. (pro se respondent father of C.F.)

Considered and decided by Connolly, Presiding Judge; Chutich, Judge; and Reyes, Judge.

## UNPUBLISHED OPINION

**CHUTICH**, Judge

Appellant A.D. challenges the district court's termination of her parental rights. Because respondent Ramsey County Community Human Services Department (the county) provided reasonable efforts to rehabilitate and reunify the family, a statutory

condition for termination existed, and termination is in the best interests of the children, we affirm.

## FACTS

A.D. is the mother of three children: C.L., born in 2005; A.L., born in 2006; and C.F., born in 2010. Since 2011, the county has worked with A.D. and the children many times to address issues relating to educational neglect, A.D.'s chemical dependency, A.D.'s mental health, and domestic violence involving A.D. The county first encountered A.D. and the children following a 911 hang-up in 2011. Police found A.D. in an argument with L.L., the father of C.L. and A.L.[1] L.L. was arrested for violating an order for protection. Because A.D. was too intoxicated to care for the children, they were placed with their maternal grandmother. The family later came to the county's attention twice in 2012 for educational neglect.

On May 31, 2013, the children were seen at Children's Hospital; they were brought via ambulance with A.D., who was coming to receive a mental health evaluation. C.L. reported that the day before, A.D. thought an intruder was in the house. A.D. called the police several times, but officers were unable to take a report because A.D. took the children to a hotel. The family then drove around in a car, and while driving, A.D. thought they were being followed, complained that there was an odd smell in the car, and stopped in the middle of the road. During her mental health evaluation, A.D. left the hospital. Police located her and transported her in handcuffs to Region's Hospital on June 1. The children were placed in a shelter the same day. C.L. and A.L. were placed in

---

[1] L.L.'s parental rights were terminated by default in 2014.

2

foster care with their paternal grandparents later in June, and the youngest child, C.F., was placed in foster care with his father, J.F., shortly thereafter. At the preliminary hearing, all were found to be doing well in these out-of-home placements.

On June 5, 2013, a petition was filed in Ramsey County District Court alleging that the children were in need of protection or services and requesting that the children be placed under the emergency protective care of the county. On September 5, 2013, the children were adjudicated in need of protection or services and legal custody was transferred to the county.

On June 18, 2013, the county intake worker made a maltreatment determination of neglect as to the children and found that A.D.'s care threatened their safety. A county social worker developed a case plan for A.D. that identified four concerns and issues: mental health, substance abuse, domestic violence, and day-to-day parenting. It also identified several tasks for A.D. to complete, including: complete a psychological assessment and follow recommendations; complete a chemical use assessment and follow recommendations; participate in domestic violence services; participate in in-home parenting services; and abstain from drug use and provide clean urinalyses. The county identified specific providers and made referrals for A.D. A.D. refused to sign the case plan. At no point did A.D. ever provide a urinalysis or complete a chemical dependency evaluation.

In August 2013, A.D. attempted to remove C.L. and A.L. from their foster home and forcibly removed C.F. from his home. She was later convicted of deprivation of

3

parental rights. All visitation was temporarily suspended and left to the county's discretion.

In December 2013, while A.D. was incarcerated, a new child protection worker was assigned. He met with A.D. in prison to review the original case plan and create an updated one. He also informed A.D. that she needed to contact him upon her release in January 2014. A.D. failed to so, and the case worker was unable to meet with her until February 2014.

At the February 2014 meeting, the child protection worker and the guardian ad litem explained the updated case plan, which identified similar issues and tasks as the earlier version, and informed A.D. of what she needed to do. At that time, A.D. had made no progress in addressing any of the issues that led to the children's out-of-home placement.

The child protection worker had A.D. submit to hair follicle testing in February 2014. The results tested positive for amphetamine and methamphetamine use within the last 90 days. Following these February 2014 meetings, the child protection worker began meeting with A.D. on a weekly, rather than monthly, basis. A third case plan was filed with the court in September 2014. This case plan identified the same issues and tasks as the previous two, and it was submitted without A.D.'s signature as her whereabouts were unknown.

A.D. was subsequently incarcerated. In October 2014, over 15 months after the county initially referred A.D. to the conducting psychologist, it arranged for a psychological examination.

4

The psychological examination showed that A.D. failed to express any insight as to how or why the children were removed and took no personal responsibility for the current issues. The psychologist identified numerous factors impairing A.D.'s capacity to parent, including:

- thinking disturbances, including atypical mental content and mental disorganization

- rigid thinking patterns, including perseverating on reuniting with her children and no awareness of her personality or mental health deficits

- minimizing substance abuse

- little capacity to understand the perspectives of others, to perceive or to understand basic needs of others, and to respond to others' needs

- limited common sense reasoning and judgment, likely causing a lack of basic understanding of children's needs at various development stages and the possibility of placing children in dangerous or inappropriate situations

The psychologist diagnosed A.D. with psychosis, possible bipolar disorder with psychotic features, and likely post-traumatic stress disorder. He concluded that she could not provide a safe, nurturing, structured, or appropriate environment for the children and that she will not be able to take care of the children independently in the future.

In May 2014, the county filed a petition to terminate A.D.'s parental rights as to C.L. and A.L. and to transfer physical and legal custody of C.F. to the child's father, J.F. In August 2014, the guardian ad litem filed a petition seeking alternative relief, asking the court to terminate A.D.'s parental rights to C.F. as well.

A hearing convened in January 2015. The child protection worker, the psychologist, C.L. and A.L.'s paternal grandmother, J.F., and the guardian ad litem

5

testified. The district court found their testimony credible and persuasive, and it noted that the children have benefitted greatly from foster care. The district court found A.D. to be combative, non-responsive, and argumentative and her testimony to be neither credible nor persuasive.[2]

The district court terminated A.D.'s parental rights to the three children. It determined that the county provided reasonable efforts to rehabilitate A.D. and to reunify her with her children and that the services provided were appropriate, adequate, and relevant; any further efforts would be futile. The district court also found that A.D.'s increasing criminality caused the circumstances leading to out-of-home placement to further deteriorate. It also concluded that: (1) A.D. substantially, continuously, and repeatedly refused and neglected to comply with the duties imposed on her by the parent-child relationship; (2) A.D. was palpably unfit to parent; and (3) reasonable efforts by the county failed to correct the conditions leading to the children's placement. *See* Minn. Stat. § 260C.301, subd. 1(b)(2), (4), (5) (2014).

The district court further concluded that terminating A.D.'s parental rights was in the best interests of the children. It found that any interest the children may have in preserving the parent-child relationship was far outweighed by their competing interest in having a safe, stable, loving, and nurturing home that A.D. was unable and unwilling to provide. It further found that delaying permanency was contrary to their best interests. The district court added that the children need a safe, stable home with a parent who was

---

[2] Following numerous outbursts by A.D. and warnings by the district court, it removed A.D. after she began cursing at the child protection worker while he testified and then threatened J.F.

willing to protect them from abuse and neglect and meet their basic needs on a daily and consistent basis, and their needs far outweighed A.D.'s desire to parent them. It found that A.D. could not provide for those needs then or in the foreseeable future and that termination was in the children's best interests. A.D. appealed.

## D E C I S I O N

### I. Reasonable Efforts

A.D. first contends that the district court incorrectly concluded that the county made reasonable efforts to rehabilitate and reunify A.D. with her children. This argument lacks merit.

Before parental rights may be terminated, clear and convincing evidence must show that the county made reasonable efforts to reunite the family. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005). To determine whether reasonable efforts were made, considerations include "whether services to the child and family were: (1) relevant to the safety and protection of the child[ren]; (2) adequate to meet the needs of the child[ren] and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h) (2014). The children's best interests, health, and safety are of paramount concern. *Id.* (a) (2014).

Whether a county has provided reasonable efforts depends on the problems presented, *In re Welfare of S.Z.*, 547 N.W.2d 886, 892 (Minn. 1996), including the length of time the county was involved and the quality of the effort given, *In re Welfare of H.K.*,

7

455 N.W.2d 529, 532 (Minn. App. 1990), *review denied* (Minn. July 6, 1990). Services must go beyond matters of form so as to include real, genuine assistance. *Id.*

The district court here determined that the county provided A.D. with reasonable efforts to rehabilitate and to reunite the family and that the services were appropriate, adequate, and relevant to facilitate a reunion. Clear and convincing evidence supports this finding.

Here, child protection services completed and filed three case plans with the court to address A.D.'s issues. The plans all focused on four main areas: mental health, chemical dependency, domestic violence, and parenting skills. These plans, particularly the areas of mental health and chemical dependency, addressed the problems presented. And the plans offered genuine assistance by requiring mental health and chemical dependency evaluations. The ultimate assistance A.D. needed could not be provided until the county knew the type and amount of help that she needed—knowledge it could not obtain without completed evaluations. Nevertheless, A.D. never completed a chemical dependency evaluation and only submitted to a mental health evaluation after she was incarcerated.

The length of time and quality of the effort given also support the district court's findings. The county worked with A.D. for child care issues beginning in 2011. The current case began in May 2013, and the petition to terminate parental rights was filed a year later. After completing a second case plan, the child protection worker's visits with A.D. increased from monthly to weekly. Despite these increased efforts, A.D. failed to

8

participate in the meetings and eventually could not be located by the child protection worker.

A.D. offers *In re Welfare of Children of T.R.*, 750 N.W.2d 656 (Minn. 2008), in support of her argument that the county did not make reasonable efforts to reunite the family, but this reliance is misplaced. In *T.R.*, a father challenged the efforts provided by the county to reunite him with his son. 750 N.W.2d at 664. The county's plan for the father focused on his drug use and required him to submit to drug assessments and tests. *Id.* at 659. On appeal, the father argued that the plan did not provide reasonable efforts because it offered no services; instead, he was merely tested for chemical use. *Id.* at 664-65. The supreme court agreed, noting that despite three chemical dependency evaluations and his admitted drug and alcohol use, the county failed to offer the father any actual chemical treatment options. *Id.* at 665. The county further failed to visit the father's home to decide if it complied with the requirement of suitable housing. *Id.* at 666. And the county made no effort to assist the father with understanding the proceedings, despite his lack of verbal skills, low I.Q., and his acknowledged difficulty with understanding the proceedings. *Id.* Because of these failures by the county, the supreme court determined that it did not provide reasonable efforts. *Id.*

The facts of *T.R.* stand in stark contrast to those present here. In both instances, the county did not provide chemical dependency treatment options. But the father in *T.R.* submitted multiple positive urinalyses, had three chemical dependency evaluations, and admitted his drug and alcohol use, yet the county failed to offer treatment options. *Id.* at 659-60, 665. Unlike *T.R.*, A.D. never provided a urinalysis sample, never completed a

chemical dependency evaluation, and continually minimized her substance abuse. We cannot say that the county failed to provide reasonable efforts to address A.D.'s substance abuse when she provided no evidence for the county to use to determine what type and amount of treatment was necessary.

Furthermore, "once a case plan has been approved by the court, the appropriate action for a parent who believes some aspect of the case plan to be unreasonable is to ask the court to change it, rather than to simply ignore it." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 388 (Minn. 2008). No evidence suggests that A.D. ever asked the court to modify her three case plans because they were unreasonable.

A.D. finally argues on this point that the district court's finding that future efforts would be futile was erroneous because evidence suggested that her medical illness is curable and could be mitigated. But the district court's futility determination was not premised solely on A.D.'s mental illness. Instead, the district court found that further efforts would be futile because A.D. "has demonstrated limited to no effort in correcting her parenting deficiencies or addressing the issues" and "has refused to make any significant change in her lifestyle," despite "[e]very reasonable community based resource [that] was utilized to enable [her] to work her case plan [and] to assist [her] in rectifying the conditions that led to child protective involvement." Accordingly, this argument lacks merit.

## II.     Statutory Criteria for Termination

A.B. next argues that the district court abused its discretion by concluding that three required statutory conditions existed to terminate parental rights.   We are unpersuaded by this contention.

On appeal from a district court's decision to terminate parental rights, we review the district court's findings of the underlying and basic facts for clear error, but its determination of whether a particular statutory basis for involuntarily terminating parental rights exists is reviewed for abuse of discretion.  *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

A district court may terminate parental rights if it finds that a condition listed in Minnesota Statutes section 260C.301, subdivision 1(b) (2014) exists.   A district court need only find that one condition exists to terminate parental rights.  *T.R.*, 750 N.W.2d at 661.

The district court determined that A.D. substantially, continuously, and repeatedly refused and neglected to comply with the duties imposed upon her by the parent-child relationship.   Minnesota law provides that this condition supports terminating parental rights.  *See* Minn. Stat. § 260C.301, subd. 1(b)(2).   Failure to satisfy key elements of a court-ordered case plan can provide "ample evidence of [a] lack of compliance with the duties and responsibilities of the parent-child relationship."  *In re Child of Simon*, 662 N.W.2d 155, 163 (Minn. App. 2003).

Here, the evidence shows that A.D. failed to satisfy key elements of her case plan. She never completed a chemical dependency evaluation, submitted urinalyses, refrained

11

from using chemicals, followed through with in-home parenting services, or adequately addressed her mental health issues. These failures demonstrate that the district court properly exercised its discretion by finding that this condition was satisfied. *See id.*

Because a district court must only find that one of the statutory conditions exists to terminate parental rights, *T.R.*, 750 N.W.2d at 661, we need not address A.D.'s remaining arguments on this point. But we have examined A.D.'s other contentions and determine that the district court properly exercised its discretion in finding that the other statutory conditions existed.

## III.    Best Interests of the Children

A.B. finally argues that the district court abused its discretion by concluding that termination of her parental rights was in the children's best interests. This argument also lacks merit.

If a district court concludes that a statutory basis exists to terminate parental rights, it then considers the best interests of the children. Minn. Stat. § 260C.301, subd. 7 (2014). The best interests of the children are paramount. *Id.* In analyzing the best interests, "the court must balance three factors: (1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child[ren]." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). Competing interests include a stable environment, health considerations, and the child's preferences. *Id.* The ultimate determination of whether termination is in a child's best interests is reviewed for abuse of discretion. *J.R.B.*, 805 N.W.2d at 905.

12

Here, the district court found that any interest the children may have in preserving the child-parent relationship was "far outweighed by their competing interest in having a safe, stable, loving, [and] nurturing home." It further found that A.D. is unable and unwilling to provide this environment or even a safe and stable home that protects the children from abuse and neglect. It also found that A.D. cannot meet the children's basic and special needs on a daily and consistent basis. The district court finally found that A.D. cannot meet these needs now or in the foreseeable future.

A.D. does not argue that the factual findings supporting these ultimate findings are clearly erroneous. Instead, A.D.'s argument on this point claims that these ultimate findings reflect an abuse of discretion because the county failed to provide reasonable efforts. But as discussed above, this contention lacks merit.

The district court did not abuse its discretion by ultimately finding that termination was in the children's best interests. The district court carefully weighed the various interests, and the record supports the underlying findings. Without alleging or showing an alternative basis for demonstrating that termination was not in the children's best interests, other than contending that the county did not provide reasonable efforts, A.D.'s argument fails. Accordingly, because the county provided reasonable efforts, the district court properly exercised its discretion in terminating A.D.'s paternal rights.

**Affirmed.**