In the Matter of the Welfare of the
CHILDREN OF T.R., T.M., P.P.,
and B.H., Parents.

No. A07–666.

Supreme Court of Minnesota.

May 30, 2008.

As Modified On Denial of Rehearing
July 2, 2008.

Samantha J. Gemberling, Gemberling Law Office, St. Paul, MN, for Appellant T.M.

Robert M.A. Johnson, Anoka County Attorney, Robert D. Goodell, Assistant County Attorney, Anoka, MN, for Respondent.

## OPINION

PAGE, Justice.

This case involves the termination of the parental rights of a noncustodial father, T.M., to his daughter, J.M. On September 17, 2005, J.M., then nine years old, called 911 to report that her mother, T.R., was fighting with her then-boyfriend, B.H. Due to the filthy conditions of T.R.'s house, the responding police officers removed J.M., and T.R.'s other two children, from the home. The district court adjudicated all three of the children to be in need of protection and services under Minn.Stat. § 260C.007, subd. 6 (2006). The court ordered a case plan that required both T.R. and T.M. to complete psychological evaluations, abstain from use of alcohol or mood-altering chemicals, provide urinary analyses (UAs) before visitation with the children, and complete chemical dependency and parenting assessments. In a subsequent trial, the court found that T.M. failed to comply with his case plan. As a result, the court terminated T.M.'s parental rights to J.M., concluding that: (1) he was palpably unfit to parent; (2) appellant Anoka County Social Services (County) made reasonable efforts at reunification; and (3) termination was in the best interests of J.M. A divided court of appeals affirmed. We reverse.[1]

T.M. and T.R. lived together intermittently after J.M.'s birth in 1996, but separated sometime in 1997. J.M. remained with T.R., but T.M. had regular visitation with J.M. two or three times a month. T.R. subsequently was involved in at least two abusive relationships, during which J.M.'s half-siblings were born. In 2004, T.M. obtained scheduled visitation rights with J.M. by court order.

On September 17, 2005, during a fight between T.R. and her then-live-in-boyfriend B.H., T.R. asked J.M. to call the

---

1. The district court terminated mother T.R.'s parental rights to all three children, as well as T.R.'s parental rights to a fourth child born during the pendency of these proceedings. T.R.'s appeal of the termination of her parental rights was dismissed by the court of appeals as untimely. The termination of T.R.'s parental rights is not before this court for review, and J.M. is the only child involved in this appeal. The parental rights of the fathers of the other three children were also terminated. The termination of their parental rights is not before the court in this appeal.

police. The responding police officers discovered that T.R.'s house was filthy, the sink was full of dirty dishes, the floors were covered with cat feces, and the children had to sleep in T.R.'s room due to fleas in their bedrooms. The children were placed in foster care, and the County filed a CHIPS petition on September 21, 2005. The petition alleged that J.M. was "without necessary food, clothing, shelter, education, or other required care," without "proper parental care," and a child "whose behavior, condition, or environment is such as to be injurious or dangerous to the [child] or others." None of the allegations in the CHIPS petition involved acts committed by T.M., who is named in the petition only as a participant. *See* Minn. R. Juv. Prot. P. 22.01 (listing participants to a juvenile protection matter).

J.M., who turned 12 years old in January 2008, has been diagnosed with Oppositional Defiant Disorder. She has also been diagnosed as under-socialized and has significant issues with authority figures. During J.M.'s out-of-home placement, her behavior has deteriorated. She has assaulted her foster parents, other foster children, and the police. J.M. was removed from her first foster home and placed in a mental health treatment program at a hospital. After her release from the hospital to a therapeutic foster home, J.M. again had to be taken to the hospital by police because her behavior "escalated out of control." While still in elementary school, she was transferred to a level 3 elementary school, a school that "offers the highest level of care for children with special educational needs but is still considered main-stream." As of December 2006,

J.M. had been removed from her foster home and placed in residential treatment.

The County initially identified four main areas of concern that needed to be addressed for reunification: (1) the lengthy history of domestic violence to which J.M. and her half-siblings were exposed; (2) T.R.'s mental health issues, which T.R. identified as depression and anxiety; (3) the condition of T.R.'s home; and (4) determining whether T.R. or T.M. had any chemical dependency issues that needed to be addressed. After consulting with T.R., the County developed a case plan for T.M. that was adopted by the district court.[2] In the court order approving his case plan, T.M. was required to complete chemical dependency, psychological, and parenting assessments, abstain from alcohol and chemical use, and undergo random urinary analysis testing (UAs). Later court orders required T.M. to submit to random UAs, provide UAs on demand, complete a chemical dependency evaluation using social services as a collateral source, and abstain from using mood-altering substances, including alcohol.

T.M. completed his psychological assessment in May 2006. The evaluator concluded that T.M. lacks verbal skills and has an I.Q. "in the Low Average range." The assessment was shared with T.M.'s social worker and J.M.'s guardian ad litem, but neither appears to have accounted for T.M.'s lack of verbal skills and low average I.Q. when interacting with him about his case plan or during meetings. T.M. testified that he had difficulty understanding what was happening during his meetings with the social worker and guardian ad litem.

---

**2.** There is no indication in the record that T.M. was involved or even consulted in development of his case plan. Nor is there any indication, despite the requirement of Minn. Stat. § 260C.212, subd. 1(d) (2006), that a parent has the right to legal counsel in the preparation of the case plan, that T.M.'s court-appointed lawyer participated in formulating T.M.'s case plan.

T.M. admits to a history of marijuana and methamphetamine abuse. His first UA, in November 2005, was positive for marijuana. T.M. did not complete any further UAs until March 2006. According to T.M., his failure to complete the required UAs was due to miscommunication, his work schedule, and transportation problems. According to the County, it was due to continued alcohol and drug use or (the County implies) lack of desire to parent J.M. Because of his failure to complete UAs, the County rescinded T.M.'s visitation rights with J.M. in February or March 2006. Between March and June 2006, T.M. provided five additional UAs, which indicated either recent marijuana use or modest alcohol use.

In order to support J.M., and in accordance with his case plan, T.M. obtained full-time employment as a welder and part-time employment in food service. He also found housing for himself and J.M. Neither the county social worker nor J.M.'s guardian ad litem visited T.M.'s new home to determine whether it was appropriate for J.M. T.M. obtained health and dental insurance that would provide coverage for J.M. as well. T.M. appeared at every court proceeding involving J.M. He also attended school meetings regarding J.M., found an appropriate level 3 school for her near his house, and confirmed that her therapist had an office near his house.

Although the social worker assigned to the matter testified that T.M. seemed confused or disconnected during meetings concerning J.M., she did not spend any time with him before or after the meeting to help him process the information, even after receiving the psychological assessment indicating his lack of verbal skills. J.M.'s guardian ad litem similarly understood that T.M. had a hard time understanding written and verbal communications, but made no effort to ensure he understood the proceedings because she assumed that T.M. would ask for an explanation if he needed one.

The district court terminated both T.M.'s and T.R.'s parental rights on January 18, 2007. A divided court of appeals affirmed the termination, concluding that: (1) there was substantial evidence of T.M.'s noncompliance with his case plan; (2) he is palpably unfit to parent J.M. for the reasonably foreseeable future; (3) the County provided T.M. with reasonable services or such services would have been futile; and (4) the termination is in J.M.'s best interests. *In re Welfare of Children of T.R., T.M., P.P., & B.H.*, No. A07–666, 2007 WL 2472743, at *3–4 (Minn.App. Sept.4, 2007).

The dissent reasoned that there was no evidence that any alcohol or drug use on T.M.'s part occurred "before the child" or was detrimental conduct "directly relating to the parent and child relationship." *Id.* at *5 (Ross, J., dissenting). The dissent further concluded that the County's drug and alcohol testing without added services to achieve abstinence did not meet the County's obligation of "reasonable efforts to rehabilitate" T.M. *Id.* at *6.

■ We review the district court's findings to determine whether they address the statutory criteria for termination of parental rights and are not clearly erroneous. *In re Welfare of P.R.L.*, 622 N.W.2d 538, 543 (Minn.2001). Because termination of parental rights cannot be based on a statutory ground not included in the petition to terminate parental rights, *In re Welfare of Child of: B.J.-M. and H.W.*, 744 N.W.2d 669, 673 (Minn.2008), we consider whether the district court's findings address only those statutory criteria for termination of parental rights alleged in the petition for termination of parental rights. A finding is clearly erroneous if it is either "manifestly contrary to the

weight of the evidence or not reasonably supported by the evidence as a whole." *Tonka Tours, Inc. v. Chadima*, 372 N.W.2d 723, 726 (Minn.1985). Nevertheless, we defer to the district court's decision to terminate parental rights. *In re Welfare of J.M., J.M., & M.M.*, 574 N.W.2d 717, 724 (Minn.1998). Therefore, if at least one statutory ground alleged in the petition is supported by clear and convincing evidence and termination of parental rights is in the child's best interests, we will affirm. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn.2004).

## I.

■ We first consider whether the district court's findings address whether T.M. is palpably unfit to be a parent to J.M., the only statutory ground for termination of T.M.'s parental rights included in the county's petition. According to Minnesota law, the juvenile court may terminate parental rights if it finds

that a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct *before the child* or of specific conditions *directly relating to the parent and child relationship* either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

Minn.Stat. § 260C.301, subd. 1(b)(4) (2006) (emphasis added).

■ We have described the burden under subdivision 1(b)(4)'s predecessor, Minn.Stat. § 260.221, subd. 1(b)(4) (1988), as "onerous": "The petitioning party must prove a consistent pattern of specific conduct or specific conditions existing at the time of the hearing that appear will continue for a prolonged, indefinite period and that are permanently detrimental to the welfare of the child." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 376–77 (Minn. 1990). Because current section 260C.301, subdivision 1(b)(4), incorporates the same statutory language,[3] we consider the burden under subdivision 1(b)(4) to be the same: the county must prove a consistent pattern of specific conduct or specific conditions existing at the time of the hearing that, it appears, will continue for a prolonged, indefinite period and that are permanently detrimental to the welfare of the child.

Our previous cases addressing the termination of parental rights for palpable unfitness inform our analysis of the county's burden here. We have held that mental illness, in and of itself, does not "permit termination of parental rights." *In re Welfare of Kidd*, 261 N.W.2d 833, 835 (Minn.1978). Rather, we consider the "actual conduct of the parent" to determine fitness to parent. *Id.* Applying this analysis, we affirmed the termination of Kidd's parental rights on grounds of palpable unfitness, not because she was mentally ill,

**3.** Minnesota Statutes § 260.221, subd. 1(b)(4) (1988), provided for termination of parental rights upon a court finding

[t]hat a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or

nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child. Current section 260C.301, subdivision 1(b)(4), includes identical language and adds a presumption, not applicable in this case, of palpable unfitness when the parent's rights to another child have been involuntarily terminated or transferred to a relative.

but because her mental illness (she was diagnosed as a chronic schizophrenic psychotic) was likely to be detrimental to the child.[4] *Id.* at 834, 836 (acknowledging Kidd's "inability to recognize the needs and limitations of the infant, her ineptness with regard to the mechanical functions of a parent, and her bizarre and potentially dangerous conduct stemming from her mental illness").

We similarly have held that mental retardation alone does not render a parent palpably unfit. *In re Welfare of P.J.K.,* 369 N.W.2d 286, 290 (Minn.1985). Rather, the mental retardation must directly affect the ability to parent. *Id.* We concluded in *Welfare of P.J.K.* that father's mental retardation rendered him palpably unfit because, among other things, he "could not grasp even the most basic parenting skills." *Id.*

On the other hand, we reversed the termination of a noncustodial mother's parental rights on grounds of palpable unfitness in the absence of evidence that her conduct—consisting apparently of sporadic visitation—"has adversely influenced her child." *McDonald v. Copperud,* 295 Minn. 440, 444, 206 N.W.2d 551, 554 (1973); *see also In re Welfare of Solomon,* 291 N.W.2d 364, 368 (Minn.1980) ("sexual misconduct" in the form of cohabitation outside of marriage should not constitute palpable unfitness if it is not likely to have an adverse effect on the welfare of the child).

These cases demonstrate what we stated in *Welfare of M.D.O.:* termination of parental rights for palpable unfitness requires a showing of "a consistent pattern of specific conduct or specific conditions existing at the time of the hearing that appear will continue for a prolonged, indefinite period and that are permanently det-

rimental to the welfare of the child." 462 N.W.2d at 377. We therefore turn to whether the district court's findings in this case address the statutory criteria for termination of parental rights on grounds of palpable unfitness. That is, we consider whether the district court's findings provide clear and convincing evidence of a consistent pattern of specific conduct on T.M.'s part, or specific conditions existing at the time of trial, that appear will continue for a prolonged, indefinite period and that are permanently detrimental to the welfare of J.M. We conclude that they do not.

■ The district court based its conclusion of palpable unfitness, in part, on T.M.'s inability to demonstrate sobriety, as evidenced by two UAs positive for marijuana use and three positive for alcohol consumption over the course of eight months and for T.M.'s failure to comply with the court's order subjecting him to random UAs. We have not explicitly examined whether alcohol or substance use, without more, can render a parent palpably unfit. But our case law suggests that alcohol or substance use does not render a parent palpably unfit in the absence of a causal connection between that substance use and the parent's inability to care for the child. In *In re Children of T.A.A.,* 702 N.W.2d 703 (Minn.2005), we concluded that there was "no causal relationship established between T.A.A.'s drug use and her inability to parent her children," despite the fact that she tested positive for marijuana and methamphetamines more than four times during a six-month period. *Id.* at 706, 710. Rather, we affirmed the termination of T.A.A.'s parental rights on the alternate ground that she refused to

---

4. For example, Kidd tried to feed crackers to her two-week-old infant, dressed the child in a scarf and blanket in 75–degree summer weather, and placed her mouth on the child's penis "to help the child's breathing." 261 N.W.2d at 834.

accept responsibility for protecting her daughters from physical and sexual abuse at the hands of T.A.A.'s boyfriends, and thus was palpably unfit. *Id.* at 708–09. Consistent with *T.A.A.*, and with our treatment of mental illness and other mental disabilities as outlined above, we hold that substance or alcohol use alone does not render a parent palpably unfit; rather, the county must demonstrate that the parent's substance or alcohol use is of a nature and duration that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the child's ongoing needs.

None of the district court's findings in this case address whether T.M.'s substance use and alcohol consumption formed a "consistent pattern of specific conduct before the child" or were "specific conditions directly relating to the parent and child relationship." *See* Minn.Stat. § 260C.307, subd. 1(b)(4). The district court made no findings whatsoever that T.M. consumed either alcohol or drugs during visitation with J.M. (which might constitute "conduct before the child"). *See id.* Nor did the district court find that T.M.'s substance use and alcohol consumption directly related to his relationship with J.M., or that T.M.'s substance use and alcohol consumption rendered him "unable, for the foreseeable future, to care appropriately" for J.M.'s needs, extraordinary as they are. *See id.* Finally, the district court made no findings suggesting that there was a causal

connection between T.M.'s alcohol and drug use and his inability to care for T.M.

■■■■ The County argues that T.M.'s noncompliance with the case plan requiring him to demonstrate sobriety is clear and convincing evidence of his palpable unfitness. We disagree. Failure to correct the conditions leading to the child's removal from the home, as evidenced by noncompliance with a case plan, is a factor for termination under Minn.Stat. § 260C.301, subd. 1(b)(5), not under 1(b)(4).[5] We presume that statutory differences in language are intentional, and we apply them consistent with that intent. *Transport Leasing Corp. v. State*, 294 Minn. 134, 137, 199 N.W.2d 817, 819 (1972). Furthermore, we construe a statute to give effect to all of its provisions. Minn.Stat. § 645.16 (2006). Consequently, we will not read subdivision 1(b)(5) factors into subdivision 1(b)(4): failure to comply with a reasonable case plan is grounds for termination of parental rights under Minn.Stat. § 260C.301, subd. 1(b)(5), but it does not necessarily render a parent palpably unfit under Minn.Stat. § 260C.301, subd. 1(b)(4). Because the district court may terminate parental rights on only those grounds set forth in the petition, and because the petition in this case alleges only palpable unfitness, the County's argument that T.M. failed to comply with his case plan is largely irrelevant to this appeal.

The district court appears to have concluded that T.M. is palpably unfit to par-

5. Minnesota Statutes § 260C.301, subd. 1(b)(5), gives the juvenile court authority to terminate parental rights if, "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." Assuming, without deciding, that T.M.'s case plan was "reasonable" based solely on T.R.'s allegations of T.M.'s substance use, we note that it is questionable whether the parental rights of T.M., a noncustodial parent, could be terminated under section 260C.301, subdivision 1(b)(5), because neither his substance use nor his alleged inability to understand J.M.'s special needs led to J.M.'s removal from her mother's home. Nor does it appear that T.M.'s substance use was a factor in the county's decision to place J.M. in third-party foster care, rather than with T.M., upon her removal from her mother's home, as permitted by Minn. Stat. § 260C.201, subd. 1(a)(1) (2006).

ent based, as well, on T.M.'s perceived lack of understanding of J.M.'s needs. Although the district court found, based on T.M.'s testimony at trial, that T.M. "has no understanding of her mental health diagnosis, special needs or the significant challenges facing [J.M.] that must be addressed before she reaches adulthood," this stops short of a finding that T.M. is "unable, for the reasonably foreseeable future, to care appropriately" for his daughter. *See* Minn.Stat. § 260C.301, subd. 1(b)(4).

We therefore conclude that the record does not support by clear and convincing evidence the district court's determination that T.M. is palpably unfit to parent J.M., now or for the foreseeable future.[6] We therefore reverse the court of appeals and remand to the district court for reinstatement of T.M.'s parental rights.[7]

## II.

■■■ Minnesota Statutes § 260C.301, subd. 4 (2006), requires that once a child has been in out-of-home placement for 15 of the most recent 22 months, the county attorney must petition to terminate parental rights or transfer custody to a relative, unless "the responsible social services agency has not provided reasonable efforts necessary for the safe return of the child." In the interests of judicial economy, we therefore address whether the County has made reasonable efforts thus far to rehabilitate T.M. and reunify him with J.M.

■■■ Under Minn.Stat. § 260.012(a) (2006), reasonable efforts "for rehabilita-

tion and reunification are always required" until the district court determines that the county has filed a petition stating a prima facie case that one of five situations exists justifying cessation of such efforts. Of those five situations, only one—that "the provision of services or further services for the purpose of reunification is futile and therefore unreasonable under the circumstances"—is arguably applicable here. The juvenile court is required to make findings as to whether the county provided reasonable efforts to rehabilitate the parent and reunify the child and parent. Minn.Stat. § 260.012(h) (2006). In doing so, the court must consider whether the services are: "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." *Id.* We have said that "[w]hen these statutory provisions are considered together with the inherent difficulty of permitting the agency seeking termination also to deny rehabilitative services, it is clear that the provision of reasonable efforts must be evaluated by the court in every case." *In re Welfare of S.Z.*, 547 N.W.2d 886, 892 (Minn.1996). Further, the "nature of the services which constitute 'reasonable efforts' depends on the problem presented." *Id.*

T.M. contends that "merely testing a parent for chemical use" is not a reasonable effort toward reunification and "flies in the face of established precedent that this Court has used to define 'reasonable

---

6. Even if we assume, without deciding, that termination of T.M.'s parental rights is in J.M.'s best interests, the child's best interests alone are not sufficient to terminate parental rights. *In re Welfare of the Children of R.W.*, 678 N.W.2d 49, 54–55 (Minn.2004). Because we conclude that the County has not demonstrated that T.M. is palpably unfit to parent

J.M. and no other grounds for termination were alleged in the petition, we do not need to decide whether the termination is in J.M.'s best interests.

7. Minnesota Statutes § 260C. 312 (2006) outlines the district court's options when parental rights are not terminated after trial.

efforts.'" He claims that he made "substantial efforts to comply with his case plan," having had three chemical dependency assessments, but the County never required him to undergo treatment or provided him with treatment options. T.M. suggests that the lack of effort on the County's part is because he was the noncustodial parent. The County argues that "additional assistance" would have accomplished nothing without T.M.'s completing the first step of demonstrating sobriety. The court of appeals' dissent notes that, "[a]t a minimum, the state's concern that chemical use constitutes parental unfitness triggers its duty to require or at least offer services, such as a treatment program, designed to end the use. All that testing does, of course, is to indicate use, not end it." *In re Welfare of Children of T.R., T.M., P.P., & B.H.*, 2007 WL 2472743, at *6 (Ross, J., dissenting).

In *In re M.D.O.*, the county concluded that the mother, who had been convicted of second-degree murder of her adopted daughter, could not be sufficiently rehabilitated to care for a second child, born after the older child's death, 462 N.W.2d at 371, because she refused to admit guilt in the death, *id.* at 377. We reversed the termination of the mother's parental rights, concluding that the county failed to provide reasonable services to help the mother admit her guilt. *Id.* In doing so, we stated that

[t]he county's expectations seem especially daunting considering the county's admitted failure to provide services, counseling or assistance to aid [the mother] in coming to grips with her conduct. It never told [her] what programs at the Shakopee institution would be appropriate for her to satisfy the case plan. It never contacted the leaders of therapy programs [she] joined. The social worker observed only one visit between M.D.O. and [the mother]. * * *

The county social workers did not communicate any of [their] expectations to [the mother] because they felt [she] did not need to be told what kinds of things would satisfy the first case plan goal. * * * Notwithstanding, the county concedes [the mother] was fulfilling other case plan goals.

*Id.*

■■■ The County's expectations that T.M. would abstain from drugs and alcohol, as the case plan in this case required, seem, in the words of *M.D.O.*, "especially daunting considering the [C]ounty's admitted failure to provide services, counseling or assistance to aid [T.M.] in coming to grips with [his] conduct." *See id.* at 377. We agree with the dissent that simply testing for substance use, without more, is not realistic under the circumstances to rehabilitate a parent who, that testing shows, suffers from chemical dependency issues. *See In re Welfare of Children of T.R., T.M., P.P., & B.H.*, 2007 WL 2472743, at *6 (Ross, J., dissenting).

■■■ The county social worker assigned to T.M. testified at trial that because T.M. never demonstrated his sobriety, he could not progress with the rest of his case plan, even though some parts of that case plan do not appear to be contingent on sobriety. We recently concluded that "a case plan that has been approved by the district court is presumptively reasonable." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 388 (Minn.2008). We further concluded that "once a case plan has been approved by the court, the appropriate action for a parent who believes some aspect of the case plan to be unreasonable is to ask the court to change it, rather than to simply ignore it." *Id.* The requirement that the parties follow the case plan is a two-way street: the county may not, as it did here, decide for itself that further efforts

are futile. Rather, if the county decides that further efforts to rehabilitate a parent and reunify parent and child would be futile, its remedy is to seek, as outlined in Minn.Stat. § 260.012(f) (2006), a court determination that reasonable efforts at reunification are no longer required. Until then, the statute requires the county to continue to provide services to the parent as outlined in the case plan or out-of-home placement plan. *See* Minn.Stat. § 260.012(a)(5) (2006) (indicating that reasonable efforts are always required until a determination by the juvenile court that the provision of services for reunification is futile).

As to whether the efforts actually made by the County in this case to reunify T.M. with his daughter were reasonable, we are struck first by the disparity in the services offered to T.R.—whose actions led to J.M.'s out-of-home placement in the first place—and those offered to T.M.—a non-custodial parent who is not alleged to have contributed in any way to J.M.'s out-of-home placement.[8] For example, both parents were ordered to complete a chemical dependency evaluation. Mother T.R. was allowed to complete three evaluations, culminating in a determination that she did not require chemical dependency treatment despite admitting to use of a long list of prescription medications. T.M., on the other hand, according to the County, apparently never received a valid chemical dependency evaluation, despite his acknowledged drug and alcohol use. Nor, apparently, was T.M. offered chemical dependency treatment. Mother T.R. received individual therapy, a psychiatric evaluation, and counseling for domestic abuse. But the County made no effort to help T.M. understand the proceedings, despite a psychological assessment that demonstrated he lacked verbal skills and has a low average I.Q. As a third example, county social workers never visited the home T.M. rented in order to comply with his case plan's requirement to obtain suitable housing for himself and J.M. Nevertheless, the County apparently never considered T.M. as a placement for J.M.

Even in the absence of the comparison to the services provided to T.R., the services provided to T.M. were not reasonable because no services were offered to address T.M.'s lack of verbal skills and acknowledged difficulty in understanding the proceedings. We therefore conclude that the district court erred in finding that the County made reasonable efforts to rehabilitate T.M. and to reunify him with J.M.

Reversed as to the termination of T.M.'s parental rights and remanded for further proceedings consistent with this opinion.[9]

---

**8.** The district court's findings of fact conclude with the observation that J.M. and her siblings

> are entitled to a safe, healthy, stable and secure environment in which to grow. Such environment must not only be free from domestic violence, but must be with a caregiver who sets appropriate boundaries, intensely supervises the children and can maintain a respectful working relationship and follow the advice of doctors, educators and therapists. [T.R. and T.M.] have not provided any of these things in the past and there is no indication that they will be able to do so at any time in the reasonably foreseeable future.

We do not dispute the district court's characterization of the children's needs. But to the extent the court's findings refer to T.M., they are clearly erroneous.

**9.** As we noted when reversing the termination of a mother's parental rights in *In re Welfare of Chosa*, 290 N.W.2d 766 (Minn.1980), we "express our desire that the proper authorities carefully monitor the situation and promptly seek termination of [T.M.'s] parental rights again if [he] is unable to meet the challenge of parenthood." *Id.* at 769. Given J.M.'s out of home placement, we also, however, encourage the parties to consider alternatives to the outright termination of T.M.'s parental rights.

DIETZEN, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

GILDEA, Justice (concurring).

I join in section I of the majority's opinion, but I write separately to note my disagreement with the majority's conclusion in section II that "[t]he County's expectations that T.M. would abstain from drugs and alcohol, * * * [was] 'especially daunting'" in the circumstances of this case. With respect to the no-use condition, the district court found that the social services agent "did everything possible to assist [T.M.] in proving sobriety," and that T.M.'s "excuse for failing to provide random UAs for four months * * * was not credible." The district court observed the witnesses and is in the best position to make these factual determinations. I do not, however, disagree with the majority's ultimate conclusion in section II that the County, like the parent, must comply with all of the terms of the case plan, or seek to have conditions of the plan altered if those conditions become futile. As the majority suggests, the County did not avail itself of that remedy in this case. Thus, while I disagree with the majority's analysis as noted above, I concur in the result.