*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0773
A15-0799**

In the Matter of the Welfare of the Children of:
H. P., A. L., J. W. H., J. R. and J. S., Parents.

**Filed October 26, 2015
Affirmed
Halbrooks, Judge**

Swift County District Court
File No. 76-JV-15-49

Jan M. Nordmeyer, Nelson Kuhn & Nordmeyer, Ltd., Glenwood, Minnesota (for appellant H.P.)

Neil R. Tangen, Tangen Law Office, Glenwood, Minnesota (for appellant J.R.)

Danielle H. Olson, Swift County Attorney, Benson, Minnesota (for respondent county)

Barbara Wiese, Ortonville, Minnesota (guardian ad litem)

Considered and decided by Hooten, Presiding Judge; Halbrooks, Judge; and Worke, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HALBROOKS**, Judge

In these consolidated appeals, appellant-mother H.P. and appellant-father J.R. argue that the district court erred by terminating their parental rights. We affirm.

# FACTS

H.P. is the mother of five children, all of whom are the subject of this termination of parental rights (TPR) proceeding. The children are M.J.-P., born February 11, 2002; A.P., born October 3, 2004; X.P., born February 1, 2006; A.R.-P., born July 4, 2011; and L.P., born January 21, 2013. The fathers of M.J.-P., A.P., X.P., and L.P. are not involved in this appeal. The district court terminated their parental rights after they ceased providing financial support and could not be located by SCHS. A.R.-P.'s father, J.R., appeared in the district court and now appeals with H.P.

H.P. has a long history with Swift County Human Services (SCHS). SCHS first became involved with H.P. and her children in 2010 by doing a family assessment based on reports that the children did not know where they were supposed to go after school. For six months, SCHS provided in-home family-based services with H.P. focused on structure, consistency, and communication. SCHS also helped H.P. pay rent.

J.R. and H.P.'s child, A.R.-P., was born in July 2011. The police were called five months later, on December 1, 2011, because J.R. had yelled at, pushed, and punched H.P. That resulted in J.R.'s first conviction of domestic assault. SCHS renewed its involvement with the family and started a child-in-need-of-protective-services (CHIPS) case. Both parents underwent mental-health and chemical-dependency evaluations as part of that case. J.R. received outpatient treatment but was discharged for noncompliance. While SCHS worked with the family for the second time, J.R. was

convicted of violating a domestic-abuse-no-contact order (DANCO) by contacting H.P. As a result of that and other convictions, J.R. spent a significant amount of time in jail.[1]

The first CHIPS case ended on April 11, 2013. On June 26, 2013, SCHS opened another investigation with the family after it was notified that J.R. violated a second DANCO. A.R.-P. was present during the incident. J.R. was arrested again. In October, SCHS began providing services through its parental-support outreach program for H.P. and J.R. after receiving reports that H.P. had no running water at her house. Those services ended in December.

On January 7, 2014, police were dispatched to H.P.'s residence because of a 911 hang up. They discovered that the call was made because of an argument between H.P. and J.R. that took place in front of all five children. The police reported the incident to SCHS, noting concern over the conditions in the home. SCHS followed up and found that the home was unsafe for the youngest two children. As a result, SCHS started new CHIPS cases for each child on February 19. J.R. was asked to participate, but he refused to comply. On April 4, J.R. was arrested and subsequently convicted of domestic assault of H.P. He was then incarcerated from April until November 2014.

In April 2014, SCHS filed an ex parte motion for emergency protective care due to domestic violence and the conditions in the home. When SCHS examined H.P.'s home, they found choking hazards for young children and items stacked on some of the children's beds to an extent that it made them unusable. The district court ordered the

---

[1] At the time of the TPR trial, A.R.-P. was four years old and J.R. had spent 703 days of her life in jail.

children to begin out-of-home placement on April 22. The CHIPS cases went to trial in May and resulted in orders for J.R. and H.P. to address SCHS's concerns related to their mental-health needs, their chemical dependency, the children's mental-health needs, the well-being of the children, and other parenting concerns.

Because J.R. was incarcerated when the order was issued, he could not participate in some of the therapy. For a portion of J.R.'s incarceration in 2014, he made occasional phone calls to his daughter. But he lost his phone privileges in jail and was then unable to place calls past summer 2014. After his release from jail, J.R. was scheduled to have structured visits with A.R.-P. But up until the TPR trial in March 2015, J.R. only had three successful visits. He missed some visits without notifying SCHS in advance; others he missed because he refused to participate in urinalysis tests.

After November 20, 2014, and before trial, J.R. completed new mental-health, chemical-dependency, and parental-capacity evaluations. J.R.'s counselor recommended that he complete treatment for anger management, stress management, and chemical dependency, participate in individual therapy, and obtain a valid driver's license. But J.R. consistently refused to participate in chemical-dependency treatment up until the time of trial, when he for the first time indicated a willingness to undergo treatment.

The services and evaluations throughout the 2014 CHIPS cases revealed concerns that both parents had to address. Both have a history of mental illness. H.P. has been diagnosed with depressive disorder, anxiety disorder, post-traumatic street disorder, dependent and passive-aggressive traits, and borderline intellectual functioning. She is also at high risk for alcohol and drug abuse, violence, and has an inability to properly

4

manage stress. J.R. has a longstanding diagnosis of bipolar disorder. He is also at high risk for violence. Throughout evaluations, J.R. tended to avoid self-disclosure and demonstrated an unwillingness to participate. Both H.P. and J.R. continued to use alcohol and marijuana up until trial.

To assist the parents, SCHS provided multiple services, including adult mental-health treatment, children's mental-health treatment, and parent coaching. But after years of providing services, SCHS determined that the efforts were unsuccessful. On February 5, 2015, SCHS petitioned for the termination of H.P.'s and J.R.'s parental rights. A trial took place in late March. Because J.R. was the only father who appeared, the district court determined that the other fathers had abandoned their children and terminated their parental rights.

Based on Minn. Stat. § 260C.301, subd. 1(b)(2), (4), (5) (2014), the district court ordered termination of J.R.'s and H.P.'s parental rights on three grounds. First, the district court determined that both J.R. and H.P. "substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed" on them as parents. Second, it determined that they are palpably unfit to parent. Third, the district court found that SCHS had made reasonable efforts to assist H.P. and J.R. to correct the conditions leading to the children's placement out of the home and to reunify the parents with the children but that those efforts were unsuccessful. This appeal follows.

**D E C I S I O N**

**I.**

In order to terminate an individual's parental rights, a district court must find that the county made reasonable efforts to reunite the family and rehabilitate the parent. *In re Welfare of S.Z.*, 547 N.W.2d 886, 892 (Minn. 1996). An appellate court reviews whether there is clear and convincing evidence that the county made reasonable efforts to reunite the family and rehabilitate the parent. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005). "The quality and quantity of efforts to rehabilitate and reunify the family impact the reasonableness of those efforts." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007), *review denied* (Minn. Mar. 28, 2007). In determining if efforts were reasonable, a district court considers whether the services were "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h) (2014).

H.P.'s sole argument on appeal is that SCHS failed to make reasonable efforts to reunify her with her children because she alleges that the efforts made were not culturally appropriate. H.P.'s mother is an enrolled member of the Mille Lacs Band of Ojibwe Indians. As required by federal and Minnesota law, SCHS sent Indian Child Welfare Act (ICWA) notices to the Mille Lacs Band of Ojibwe for all five children as well as to the Leech Lake band of Ojibwe and White Earth Tribe for L.P., whose father is also Indian.

6

None of the Indian tribes indicated that the children are eligible for enrollment or in some other way triggered ICWA. So they did not intervene.[2]

Throughout the years, SCHS provided multiple services to H.P. and her children. The case plans included a parenting coach, parenting classes, skills training, family therapy, individual mental-health treatment for the children, individual therapy for H.P., Challenge Program assistance (to help educate the children), structured visitations, financial and budgeting assistance, safety plan creation, and medication management. In total, SCHS estimates that it spent more than $103,000 on rehabilitation and reunification efforts for H.P., J.R., and the children.

H.P.'s parent coach testified at trial that H.P. often appeared disinterested or distracted during the parent-coaching sessions. At several supervised visits, the parent coach observed that H.P. was unengaged with the younger children for long periods of time, sometimes not knowing where they were. H.P. also consistently yelled at, threatened, and improperly or ineffectively disciplined her children. The parenting coach testified that H.P. was either unable or unwilling to put appropriate supervision and disciplinary skills into practice.

---

[2] At the district court, H.P. argued that ICWA applies to this case. The district court held that ICWA does not apply to this case, and H.P. has not challenged that ruling on appeal. Therefore, we do not address that issue. *See Melina v. Chaplin*, 327 N.W.2d 19, 20 (Minn. 1982) (holding that issues not briefed on appeal are waived). Had ICWA governed the proceedings, the district court's standards and procedures would have been different. *See* 25 U.S.C § 1912(d) (2012) (requiring "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family").

According to the parenting coach, H.P. seemed unaware of dangerous or unsafe conditions for children in the home. Visitation supervisors had to frequently intervene for the children's safety because H.P. was distracted. And she continued to struggle with the cleanliness of the home—sometimes leaving items dangerous to children lying around. H.P. openly disagreed with the parenting coach and told the social worker that she did not intend to follow the majority of the parenting coach's recommendations. H.P. was a frequent no-show for appointments or canceled at the last minute. This attendance problem extended to H.P.'s therapy sessions as well, resulting in termination of therapy services.

H.P. was ordered to not allow other people to reside in her home and to focus on her children. Nevertheless, she permitted her brother, uncle, and a boyfriend with an active arrest warrant to stay with her. One planned unsupervised overnight visit with her children was canceled when, upon their arrival, H.P. was found in bed with a man later identified with a history of felony domestic assault.

H.P. is Indian but not an enrolled member of any tribe. She argues that despite all of SCHS's services and her inability to succeed with her case plan, SCHS's efforts were unreasonable because they were not culturally appropriate. But other than making that general assertion, H.P. did not articulate how the services were not culturally appropriate at trial, in her brief, or at oral argument. She did not present any witness or evidence that outlined what should or could have been done differently to make her successful in her case plan. She also failed to present evidence that she was actively involved in an Indian community.

Based on our review of this extensive record, we conclude that the record supports by clear and convincing evidence the district court's decision that SCHS made reasonable efforts to reunify H.P. with her children.

## II.

J.R. argues that SCHS's reunification efforts with respect to him were unreasonable. Specifically, he argues that he did not have sufficient time for his treatment to be successful or to serve as a basis to reunify him with A.R.-P. Further, J.R. asserts that, to his detriment, SCHS focused more on H.P. and less on him.

SCHS provided services to J.R. beginning in 2011. Throughout his time in and out of jail, SCHS provided chemical-dependency and mental-health evaluations, structured visits, and out-patient treatment. J.R. declined or failed to participate in services SCHS offered, including family-based therapy, rides to and from structured visits, further out-patient or in-patient treatment for chemical use, devising a safety plan, and urinalyses (random or scheduled).

J.R. points out that the termination petition was filed on the same day that his evaluations that outlined steps that he should take going forward in the 2014 CHIPS case were completed. As a result, he asserts that he was not given a reasonable opportunity to complete those steps. J.R. argues that evaluations alone do not constitute reasonable efforts. We agree that the services provided must "go beyond mere matters of form so as to include real, genuine assistance." *In re Welfare of H.K.*, 455 N.W.2d 529, 532 (Minn. App. 1990), *review denied* (Minn. July 6, 1990). Evaluations alone are not enough. *See In re Welfare of Children of T.R.*, 750 N.W.2d 656, 665 (Minn. 2008) ("[S]imply testing

9

for substance abuse, without more, is not realistic under the circumstances to rehabilitate a parent who, that testing shows, suffers from chemical dependency issues.").

But J.R.'s focus on what services were offered and provided is too narrow. Before going to jail, he refused to cooperate with random urinalyses and the family-based therapy offered to him by SCHS. SCHS urged him to make a safety plan in order to diminish domestic violence around the home. Instead of completing the plan, J.R. committed another domestic assault against H.P. in front of the children. During his time in jail, J.R. received phone calls meant to maintain or improve his relationship with A.R.-P., but he lost his phone privileges for bad behavior. Further, even after J.R. was released, SCHS tried to provide structured visits with A.R.-P. Most did not occur because he failed to show up or refused a mandatory drug test.

J.R. places considerable weight on *T.R.* to support his argument that H.P. was the focus of SCHS's efforts to his detriment. But *T.R.* is distinguishable from this case. The district court in *T.R.* terminated the parental rights of T.M., the father, on the statutory ground of palpable unfitness, finding that T.M. was unable to demonstrate his sobriety based on his failure to comply with court-ordered random urinalyses and his five positive tests for marijuana or alcohol. *T.R.*, 750 N.W.2d at 659-60. There was no confrontation with or abuse of T.R. caused by T.M.'s consumption of alcohol or drugs. This court, in a 2-1 decision, affirmed the district court. *Id.* at 660. But the supreme court reversed on the termination of T.M.'s parental rights, holding that

> substance or alcohol use alone does not render a parent palpably unfit; rather, the county must demonstrate that the parent's substance or alcohol use is of a nature and duration

10

that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the child's ongoing needs.

*Id.* at 663. The district court in *T.R.* made no findings "that T.M.'s substance use and alcohol consumption rendered him 'unable, for the foreseeable future, to care appropriately' for [his child's] needs." *Id.*

Here, J.R.'s lack of a chemical assessment prior to trial was due to the fact that he refused to participate in random urinalyses and only agreed to do the chemical assessment during trial. More significantly, J.R. assaulted H.P. in front of the children. And at least one of the domestic incidents that took place between J.R. and H.P. in front of the children involved consumption of a considerable amount of alcohol. That conduct contributed to the reasons the children were removed from the home and resulted in J.R.'s convictions and his time away from A.R.-P. Thus, we reject J.R.'s argument.

In his brief, J.R. asserts two other issues contesting the district court's decision pertaining to whether he complied with his duties as a parent and whether he is palpably unfit to parent his child but failed to provide argument or legal support for those issues. Thus, those arguments are waived, and we do not address them. *Melina*, 327 N.W.2d at 20.

At oral argument, J.R. attempted to provide extra-record evidence about how his treatment is progressing. But "[i]t is well settled that an appellate court may not base its decision on matters outside the record on appeal, and that matters not produced and received in evidence below may not be considered." *Plowman v. Copeland, Buhl & Co.,*

11

261 N.W.2d 581, 583 (Minn. 1977).  Thus, we have not considered that evidence in our review.

Having carefully reviewed the record, we conclude that there is clear and convincing evidence to support the district court's determination that SCHS made reasonable efforts to reunify the parents with their children.  The district court did not err by terminating H.P.'s and J.R.'s parental rights.

**Affirmed.**