*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-0841**

In the Matter of the Welfare of the Child(ren) of: S. S., Parent.

**Filed November 10, 2025**
**Affirmed**
**Bjorkman, Judge**

Washington County District Court
File No. 82-JV-23-471

Amy L. Senn, Amy L. Senn, P.A., Afton, Minnesota (for appellant-father J.A.W.)

Kevin Magnuson, Washington County Attorney, Anthony Zdroik, Assistant County Attorney, Stillwater, Minnesota (for respondent Washington County Child Protection)

Katie Mathurin, Children's Law Center of Minnesota, St. Paul, Minnesota (for child)

John P. Chitwood, St. Paul, Minnesota (for respondent-mother S.S.)

Nancy Cottrell, Stillwater, Minnesota (guardian ad litem)

Considered and decided by Worke, Presiding Judge; Bjorkman, Judge; and Cochran, Judge.

**NONPRECEDENTIAL OPINION**

**BJORKMAN**, Judge

Appellant-father challenges the order transferring permanent legal and physical custody of his child to maternal relatives, arguing that the district court clearly erred by finding that (1) respondent-county made reasonable efforts to reunify him with the child, and (2) transfer of custody is in the child's best interests. We affirm.

# FACTS

Appellant J.W. (father) and S.S. (mother) are the parents of S.W. (child), born in 2016. Parents separated in December 2016, after which child lived with mother.[1] Child came to the attention of respondent Washington County Community Services (the county) in August 2022, upon reports that mother was using methamphetamine in the home. During its investigation, the county learned that father has anger-related issues and a history of conflict with mother dating back to 2017, when mother contacted police to report an altercation in which father yelled at and pushed her. Mother told the first social worker assigned to the case that in June or July 2022, child returned from spending time with father and reported that father berated mother in front of child and child's older brother. When brother intervened to defend mother, father "became really angry and put him down and said that no one loves him." Child stated that "her dad was really scary." Mother told the social worker that she was also frightened of father, describing him as mentally unstable and a "psycho." She explained that she often "block[ed] [father] from having contact [with her] because of his behavior."

In September 2022, the county filed a petition alleging child needed protection or services (CHIPS) based on mother's chemical use and resulting inability to pay rent. Following an emergency protective-care hearing, child was placed with relatives J.G. and V.G. (former guardians). Two months later, the district court adjudicated child as CHIPS.

---

[1] Between 2017 and 2020, father cared for child approximately 64 days per year. In 2021, father cared for child for 96 days, and in 2022 father cared for child for 44 days. Father has not had contact with child outside of visitation since July 2022.

2

Although father was a noncustodial parent, the county developed case plans and provided services to him that were primarily aimed at addressing his anger issues and developing healthier interactions with child and mother. Father's October 2022 initial case plan required him to engage with parental education services (for parent-to-parent conflict), participate in parenting services (to support parent-to-child interactions), undergo a psychological evaluation, complete a parenting assessment, and follow all recommendations. His three successive case plans contained the same components, at least in part because father did not comply with them.

Despite knowing from early in the juvenile-protection proceedings that he needed to engage in services to address his mental health, father refused to complete the first step of that process—a psychological evaluation—until April 2023. The psychologist determined that father exhibited narcissistic and antisocial personality traits.[2] The psychologist indicated that individuals with antisocial traits show a disregard for others' rights, problems with impulsivity, deceitfulness, and a lack of remorse or empathy. And she explained that individuals with narcissistic traits may display harmful parenting practices, including emotional distancing or neglect and lack of empathy for their child. The psychologist recommended father pursue individual mental-health therapy and seek further psychological evaluation.

---

[2] We are mindful that mental-health records are not accessible to the public. Minn. R. Pub. Access to Recs. of Jud. Branch 4, subd. 1(f). We limit our discussion of such records in this opinion to information disclosed in publicly filed documents.

Father completed a parenting assessment that summer. The assessor recommended child not be placed with father at that time, opining that father has personality traits that are not conducive to being a good parent, like narcissistic traits that do not allow him to understand others' perspective or display empathy to others. The assessor recommended, among other things, that father get involved in individual therapy with a trained therapist working with personality disorders and engage in family therapy when approved by child's therapist.

Father obtained his own psychological diagnostic assessment[3] in December. After meeting with father, the assessor concluded that father could benefit from individual therapy and psychological testing to explore the presence of a personality disorder.

Father's second psychological evaluation took place in February 2024 and largely confirmed what the previous assessor found. The second psychologist opined that father technically meets the diagnostic criteria for narcissistic personality disorder, but the presence of antisocial traits makes a diagnosis of "Other Specified Personality Disorder" more appropriate. The psychologist recommended that father complete an anger-management program, participate in long-term individual therapy with a trauma-focused provider, and engage in family therapy, in consultation with child's therapist, to improve his ability to meet child's emotional needs.

---

[3] A diagnostic assessment is based only on the interview with the examinee. In contrast, a psychological evaluation involves psychological testing and consideration of collateral information, such as reports from social workers.

Father did not begin individual therapy in earnest until late July, when he began seeing a therapist of his own choosing.[4] But the therapist's sparse treatment records do not reflect any sustained effort to address the underlying personality traits that affect father's parenting ability.

With respect to permanency planning, the county petitioned the district court in September 2023 to transfer custody of child to former guardians. Three months later, father petitioned the district court to transfer custody of child to him.[5] Former guardians took themselves out of consideration as a permanency option after an incident that occurred during a November 18 supervised visit at Minnesota Families United. On that occasion, child refused to leave former guardians' car. Father "immediately started yelling" at staff and former guardians, frightening child. In response, the county moved child to the home of a maternal great aunt, K.W., and great uncle, P.W. (foster parents). In September 2024, the county amended its permanency petition, asking that legal and physical custody of child be transferred to foster parents.

The district court held a six-day trial in January and February 2025. At the time of trial, child had been in out-of-home placement for 29 months. The district court received 123 exhibits and heard testimony from 13 witnesses, including parents, three social

---

[4] Father attended five individual therapy sessions with a county-referred therapist between March 2024 and June 2024. He terminated the sessions because "his court case is going in a different direction."

[5] In April 2024, mother filed her own petition seeking transfer of custody to father. But at trial, she testified in support of child being with foster parents "right now."

workers, the two psychologists who evaluated father, the parenting consultant, foster parents, the guardian ad litem (GAL), and three of father's relatives.

In addition to the facts described above, the witnesses testified about father's refusal to participate in case planning or engage in services. When the first assigned social worker met with father in October 2022 to discuss case planning, father refused to participate. At a later follow-up meeting to discuss a draft case plan, father spent most of the meeting disputing the plan's reference to his "tendency to become angry," rather than talking with the social worker. Father's anger and reticence to participate in the case-planning process continued. Another social worker described a December 2024 meeting in connection with the fourth case plan during which father became angry, talked over the social worker, and refused to participate in the planning efforts. Father's lack of cooperation included repeated refusals to sign his case plans. Three of his plans were submitted to and approved by the district court without his signature.

Following the trial, the district court issued a thorough, detailed 70-page order transferring legal and physical custody of child to foster parents. The district court found that (1) the county made reasonable efforts to reunify father with child, (2) father's own conduct and choices created obstacles to his success, (3) father's efforts did not correct the conditions that led to child's out-of-home placement, and (4) the transfer of custody is in child's best interests. And the district court expressly found the testimony of the three social workers, two psychologists, the parenting consultant, GAL, and foster parents credible.

Father appeals.

**DECISION**

On appeal from an order permanently transferring custody of a child, we review the district court's "factual findings for clear error and its finding of a statutory basis for the order for an abuse of discretion." *In re Welfare of Child of D.L.D.*, 865 N.W.2d 315, 321 (Minn. App. 2015), *rev. denied* (Minn. July 20, 2015). In doing so, we "view the evidence in the light most favorable to the findings, do not find . . . facts, do not reweigh the evidence, [and] do not reconcile conflicting evidence." *In re Welfare of Child of T.M.A.*, 11 N.W.3d 346, 355 (Minn. App. 2024). "A district court abuses its discretion if it makes findings of fact that lack evidentiary support, misapplies the law, or resolves discretionary matters in a manner contrary to logic and the facts on record." *Id.*

A district court may "order a transfer of permanent legal and physical custody to . . . a fit and willing relative." Minn. Stat. § 260C.515, subd. 4(a)(2) (2024). To do so, the district court must make detailed findings about:

> (1) how the child's best interests are served by the order;
> (2) the nature and extent of the responsible social service agency's reasonable efforts . . . to reunify the child with the parent or guardian where reasonable efforts are required;
> (3) the parent's or parents' efforts and ability to use services to correct the conditions which led to the out-of-home placement; and
> (4) that the conditions which led to the out-of-home placement have not been corrected so that the child can safely return home.

Minn. Stat. § 260C.517(a) (2024). Each of these findings must be supported by clear and convincing evidence. Minn. R. Juv. Prot. P. 58.03, subd. 1.

7

The district court made detailed findings on all four statutory factors. Father challenges only two of them, arguing that the district court clearly erred by finding that (1) the county made reasonable efforts to reunify him and child and (2) transfer of custody is in child's best interests.[6] We address each argument in turn.

## I. The district court did not clearly err in finding that the county made reasonable efforts to reunify father and child.

As a general rule, permanent placement of a child outside of a parent's home may occur only if the county made reasonable efforts to reunify the family. Minn. Stat. § 260.012(a) (2024). Indeed, the district court must make detailed findings on "the nature and extent" of the county's reasonable efforts before transferring a child out of a parent's custody. Minn. Stat. § 260C.517(a)(2). "[W]hat constitutes 'reasonable efforts' depends on the facts of each case." *In re Welfare of Child of J.H.*, 968 N.W.2d 593, 601 (Minn. App. 2021), *rev. denied* (Minn. Dec. 6, 2021). "[R]easonable efforts" generally mean the case planning and other "services" provided to the family by the county. Minn. Stat. § 260.012(f) (2024).

In determining whether a county's efforts were reasonable, the district court must consider whether the services provided were:

> (1) selected in collaboration with the child's family and, if appropriate, the child;
> (2) tailored to the individualized needs of the child and child's family;
> (3) relevant to the safety, protection, and well-being of the child;

---

[6] Father challenges only the district court's underlying findings of fact. He does not contend that the court abused its discretion in determining there is a statutory basis to transfer custody of child to foster parents.

(4) adequate to meet the individualized needs of the child and family;
(5) culturally appropriate;
(6) available and accessible;
(7) consistent and timely; and
(8) realistic under the circumstances.

Minn. Stat. § 260.012(h) (2024).

The district court found that the county's efforts included case-management services, parenting classes, psychological evaluations, a parenting assessment, individual therapy, supervised visits, in-person and remote visits, gas cards, and transportation to and from visits. Father contends that these efforts were not reasonable because (1) "[the county] failed to make diligent efforts to assess whether [he] was willing and capable of providing day-to-day care of the child," and (2) the county did not continuously provide or make services available as evidenced by the period of seven months during the middle of the proceeding when no court-approved case plan was in place. Neither contention persuades us to reverse.

### A. Parenting-Related Services

As noted above, a primary focus of the county's efforts was father's anger-related issues associated with his narcissistic and antisocial personality traits. These concerns were borne out by the two psychological evaluations and the parenting assessment that prompted various treatment recommendations. The district court ordered father to follow these recommendations in November 2023, December 2023, January 2024, and February 2024.

Father attended only five sessions with the county-referred therapist. When he finally began a regular course of therapy in late July 2024, it was with his chosen therapist.

9

As the district court found, the therapist's notes include "no specific information or examples of how [father] has addressed or made sustained behavior change regarding emotional regulation, communication, empathy, impulse control[,] and self-awareness." Importantly, that situation was unchanged at the time of trial. The therapist's January 28, 2025 letter does not suggest that the therapy sessions led to any behavioral changes that would improve father's parenting ability.

The county offered other services directed toward improving father's ability to safely care for child. These included a referral to the Circle of Security program, which helps parents understand their child's emotional needs and support the child's "ability to successfully manage emotions and behaviors." Father declined to participate. Other services included supervised in-person and remote visits with child, gas cards, and other transportation assistance.

In sum, the record supports the district court's determination that the county made myriad reasonable efforts to help father improve his ability to safely parent child. The recommendation to pursue individual therapy—to treat father's antisocial and narcissistic personality traits—was particularly tailored to address the mental-health and anger issues that compromise father's parenting ability. *See In re Welfare of Child. of T.R.*, 750 N.W.2d 656, 664 (Minn. 2008) ("[T]he nature of the services which constitute 'reasonable efforts' depends on the problem presented." (quotation omitted)).

**B. Seven-Month Gap in Court-Approved Case Plans**

Father asserts that because there was no court-approved case plan between October 1, 2023, and April 12, 2024,[7] the county's efforts were not reasonable. He cites *In re Welfare of Child. of A.R.B.*, 906 N.W.2d 894, 898-99 (Minn. App. 2018), for the proposition that the absence of a case plan means that the social-services agency failed to make reasonable efforts at reunification. We are not convinced.

In *A.R.B.*, we reversed the termination of the father's parental rights where the county contacted the incarcerated father twice but otherwise "made no effort to assist him in identifying any potentially suitable programming available to him while he was in prison that may have facilitated his opportunity to reunify with the child." 906 N.W.2d at 895. We reasoned that the case-planning statute mandates a court-approved written case plan, with rare exceptions that were not present there. *Id.* at 897-98. In concluding that the district court abused its discretion, we focused on two key facts: there was no court-approved case plan at any point during the pendency of the case, and the father was given no guidance—at all—about "what steps he needed to take to correct the conditions" that led to the child's placement. *Id.* at 899.

The circumstances here are different. First, father had four court-approved case plans covering about 22 of the 29 months the juvenile-protection proceedings were pending. Each case plan contained detailed requirements set out in at least a dozen pages.

---

[7] Father contends there was no case plan between October 1, 2023, and July 30, 2024, a period of nine months. This discrepancy is due to the fact that the county initiated the third case plan on April 12, 2024, but did not file it with the district court until July 30, 2024. As explained above, this discrepancy does not affect our analysis.

11

Second, the record shows that father received services during the period when there was no court-approved case plan, including: (1) a December 2023 court order directing father to comply with the case plan on file, including participating in individual therapy as recommended by the April 2023 psychological evaluation, (2) a second opinion in the form of a diagnostic assessment that recommended individual therapy in December 2023, (3) a second psychological evaluation in February 2024 that recommended he seek individual therapy, (4) individual therapy with a county-recommended therapist beginning in mid-March 2024, and (5) supervised visits with child.

Not only did father actually receive services during the gap period, but the record demonstrates that he knew the "steps he needed to take to correct the conditions in the absence of a case plan." *Id.* Indeed, the requirements were essentially unchanged from plan to plan. In that regard, this case is like *In re Welfare of Child of R.V.M.*, where we rejected the parent's argument that the county's failure to file a timely written case plan amounted to a failure of reasonable efforts. 8 N.W.3d 680, 695-96 (Minn. App. 2024), *rev. denied* (Minn. July 19, 2024). We reasoned there, as we do here, that the lack of a court-approved case plan is not, in itself, determinative, so long as the parent is aware of and understands the steps to take to achieve reunification. *Id.* at 696.

On this record, we discern no clear error by the district court in finding that the county made reasonable efforts to reunify father and child.

12

**II.** **The district court did not abuse its discretion in determining that placement with foster parents is in child's best interests.**

A district court's permanency determination "must be governed by the best interests of the child." Minn. Stat. § 260C.511(b) (2024). This requires the court to consider and evaluate "all relevant factors." *Id.* (a) (2024). One factor is "the relationship between the child and relatives and the child and other important persons with whom the child has resided or had significant contact." *Id.* (b). A district court must "provide insight into which facts or opinions were most persuasive of the ultimate decision, or . . . demonstrate the [district] court's comprehensive consideration of the statutory criteria." *In re Welfare of M.M.*, 452 N.W.2d 236, 239 (Minn. 1990). We review a district court's best-interests determination for an abuse of discretion. *J.H.*, 968 N.W.2d at 600. A district court abuses its discretion if, among other things, it misapplies the law or makes factual findings that lack support in the record. *T.M.A.*, 11 N.W.3d at 355.

The district court found that transfer of legal and physical custody to foster parents is in child's best interests because "it will provide [child] with stable, consistent, and safe care providers." The court found that child had thrived during the six months she had been placed with foster parents and looks to them "as the care-providers who meet her needs and who she relies on to discuss what is happening in her life." The court further found that foster parents have "maintained the important relationships to [child] to her brother . . . and her grandparents," and "it would set [child] back to be removed from that home."

As to father, the district court found that he "refuse[s] to acknowledge . . . that he struggles with anger," and "has not progressed in therapy to demonstrate any behavioral

13

change that will make him a consistent and safe legal custodian for [child]." The court also found father's "actions have shown he lacks empathy" and that "[t]he delay in accessing therapy was a choice made by [father]."

The district court also found that child "does not want to live with her father despite her strong bond with him" and that she "has clearly expressed a desire to live with [foster parents]."

The record supports these findings. To convince us otherwise, father argues that (1) the GAL's testimony was not credible because she did not visit father's home or independently investigate his ability to meet child's needs, (2) the district court clearly erred by making no findings regarding the suitability of father's home or the environment in which child would live, and (3) the district court erred by making no findings regarding father's willingness to support child's desire to maintain contact with child's relatives. The record defeats these arguments.

First, the district court expressly found the GAL's testimony credible. "We defer to the district court's determinations of witness credibility and the weight to be given to the evidence." *In re Welfare of T.D.*, 731 N.W.2d 548, 555 (Minn. App. 2007); *see M.M.*, 452 N.W.2d at 239 (stating a district court's witness-credibility findings "provide insight into which facts or opinions were most persuasive of the ultimate decision"). And the record amply supports the district court's credibility determination. The GAL testified that, when she was assigned to the case, she reviewed the reports from and talked with the previous GAL, "read psychological assessments," and met with the then-current social worker. She met with child and father during supervised visits because she believed "it was more

14

important for [her] to observe [father] with [child]," since the decision was whether father was "the appropriate person for this child to go back to." During those visits, the GAL observed that child "loves [father] and that he loves her," but she "worr[ies] that [father] is not able to parent [child] in the way she needs to be parented" because he does not "pick[] up on her cues." The GAL also noted that she did not visit father's home because "[child] is not in that home."

The GAL also observed child's interactions with foster parents, opining that foster parents are meeting child's medical and developmental needs, and supporting child's interactions with the community, including in school programs and with friends in her neighborhood. The GAL ultimately supported the permanent transfer of custody to foster parents because child "needs a home with parents who are consistent, who are stable, who provide a safe environment, who meet her needs ahead of everybody else's."

Second, the district court made numerous supported findings regarding father's parenting obstacles—most notably his largely untreated anger and mental-health issues—that directly impact his ability to provide a safe environment for child. Although we "need not go into an extended discussion of the evidence to prove or demonstrate the correctness of the findings of the district court," *T.M.A.*, 11 N.W.3d at 355 (quotation omitted), we observe that the district court, relying on the testimony from two psychologists and the parenting assessor, found that father's narcissistic and antisocial personality traits have a substantial, pervasive, and negative impact on his ability to safely parent child. In other words, the district court considered the home environment father would provide and found placing the child there is not in child's best interests.

Finally, father criticizes the district court for not making detailed findings regarding "the relationship between the child and relatives and the child and other important persons with whom the child has resided or had significant contact." Minn. Stat. § 260C.511(b). Father's argument is unavailing. The district court did make factual findings regarding foster parents' and father's respective abilities and willingness to maintain contact between child and her relatives. In one finding, the district court cites father's statement to the first psychological examiner about separating child from her older brother out of concern that father would be blamed for brother's behaviors and that brother would have a negative influence on child. In another finding, the district court referenced father telling child during a supervised visit "that they would move to Florida and [he] was going to get rich by suing [former guardians] and putting them in jail."

The record includes father's testimony that he would allow child to continue having relationships with her maternal grandparents, foster parents, mother, and brother. Foster parents likewise testified that contact between child and her relatives would continue. The district court expressly found foster parents' testimony credible; it made no such finding as to father's testimony.

In sum, our careful review of the record reveals no clear error in the district court's findings that the county made reasonable efforts to reunify father and child and no abuse of discretion in the court's determination that transfer of custody to foster parents is in child's best interests.

**Affirmed.**