*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0996**

In the Matter of the Welfare of the Child of: D. C., Parent

**Filed December 5, 2016
Affirmed
Hooten, Judge**

Ramsey County District Court
File No. 62-JV-15-2514

Nicole S. Gronneberg, St. Paul, Minnesota (for appellant D.C.)

John J. Choi, Ramsey County Attorney, Kathryn M. Eilers, Assistant County Attorney, St. Paul, Minnesota (for respondent Ramsey County Community Human Services Department)

Thomas Nolan, St. Paul, Minnesota (for guardian ad litem)

Considered and decided by Larkin, Presiding Judge; Hooten, Judge; and Smith, John, Judge.[*]

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

On appeal from the termination of her parental rights, appellant mother argues that the district court failed to make reasonable efforts to reunite her with her child. We affirm.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**FACTS**

At the time of trial, appellant D.C. was the biological mother of three children: K.D.D., born in August 2007; D.D.C., born in May 2009; and D.M.C., born in October 2012. Only appellant's parental rights to D.M.C. are at issue in this appeal.[1] The county filed a petition to terminate appellant's parental rights to D.M.C. on September 18, 2015. A trial was held on the matter over four days: December 15, 2015; March 28-29, 2016; and May 9, 2016. The following evidence was presented at trial.

Respondent Ramsey County Community Human Services Department (the county) first provided child protection services to appellant from 2008 to 2009. At that time, appellant received parenting education and the services of a public health nurse. Appellant received in-home parenting services beginning in February 2009. The county obtained a diagnostic assessment for appellant and provided her with bus cards, a car seat, a bassinet, a double stroller, and gift cards to a grocery store. Because she failed to continue attending high school, appellant lost her Minnesota Family Investment Program (MFIP) benefits. The county obtained special needs daycare for the children until appellant was back on MFIP. During the time that she was receiving these services, appellant committed the offense of malicious punishment of a child against her nine-year-old brother. The county made a maltreatment determination against appellant as a result of this incident.

Appellant received further child protection services beginning in June 2013 after a neighbor saw marks on D.D.C.'s back. Doctors at the Midwest Children's Resource Center

---

[1] The parental rights of R.L., the adjudicated father of D.M.C., were terminated on March 28, 2016.

(MCRC) examined both K.D.D. and D.D.C. and determined that the children had injuries consistent with physical abuse. During an interview with a county employee, appellant stated that she "whooped [the children] hard." The county made a maltreatment determination, and appellant was convicted of malicious punishment of a child. All three children were put in out-of-home placement.

In 2013, Michelle Seymore was assigned as the primary child protection worker for the family and continued to be the assigned social worker throughout the termination proceedings. Seymore created a case plan for appellant, which included parenting education, and helped appellant with finding housing, coordinating with her probation officer, and moving to Nebraska.

Sometime in the summer or fall of 2013, the county referred appellant to a parenting trainer. Appellant met with the trainer from October 2013 to February 2014. The trainer taught appellant how to find and access resources and worked with appellant on parenting skills. Appellant told the trainer a number of times that she wanted her children to live with K.D., a woman who had been like a mother to appellant. The trainer observed that appellant did not seem committed to improving her parenting skills. At the time that the trainer's parenting education work with appellant ended in February 2014, the trainer believed that appellant was not committed to making the changes necessary to become a good parent.

After 152 days in out-of-home placement, the children were returned to appellant's care for a trial home visit. The trial home visit ended 17 days later, when appellant was arrested, and subsequently convicted, of driving while impaired (DWI). After the trial

3

home visit failed, the children went to live with K.D. at her home in Nebraska. The children lived in Nebraska with K.D. for a total of 179 days—from December 2013 to June 2014—before they were returned to appellant's care. The child protection case was subsequently dismissed.

Appellant was involved with child protection a third time in January 2015, after D.D.C. reported that he had been sexually abused by two of appellant's brothers. Medical staff at MCRC interviewed and examined D.D.C. regarding the sexual abuse. MCRC staff noted physical injuries to D.D.C., specifically several areas of abraded or scabbed lesions on his face and neck and two long, parallel, linear, red blanching marks below his right shoulder. When asked about D.D.C.'s injuries, appellant denied harming him and stated that she had had parenting classes that taught her appropriate disciplinary techniques. MCRC staff recommended that D.D.C. see a therapist who specializes in working with victims of child sexual abuse. Appellant failed to obtain therapy for D.D.C.

During this involvement with child protection, an intake child protection worker made a referral to a social service agency so that appellant could obtain furniture for her apartment. Though the furniture provided by the program is free, the county paid for the agency's application and furniture delivery fees.

Appellant became involved with child protection a fourth time in April 2015 after K.D.D. reported to school staff that her mother had choked her, lifted her off the ground, and threatened her. K.D.D. stated that she was afraid to go home. The responding police officer determined that the children needed to be placed on a police hold, rather than returned to appellant's care. A child protection worker interviewed K.D.D., who again

4

stated that her mother choked her and lifted her off the ground. K.D.D. and D.D.C. both reported that appellant had slapped D.D.C the previous day and stated that they did not want to return home because they were scared. K.D.D. and D.D.C. gave consistent accounts of abuse by appellant to Seymore and the guardian ad litem (GAL). The county made a third maltreatment determination against appellant.

When appellant learned that K.D.D. and D.D.C. had been put on a police hold, appellant called K.D. and asked if K.D. would come to Minnesota to take D.M.C. In April 2015, D.M.C. was placed with K.D. and remained there through the termination proceedings.

In May 2015, a case aide for the county provided appellant with a case plan, and appellant signed the plan and returned it. The case plan required, among other things, that appellant undergo parenting education, a parenting assessment, a mental health assessment, anger management, and counseling. The case aide transported K.D.D. and D.D.C. to visits with appellant and supervised the visits. The case aide noted that appellant always came late to the visits and always brought someone else with her. The case aide stated that appellant spent most of her time interacting with the adults she brought with her to the visits, rather than the children.

In June 2015, both K.D.D. and D.D.C. were scheduled to fly to Hawaii for an extended visit with their father. Appellant testified that she was not notified that the two older children were being sent to Hawaii and that she was not offered a farewell visit. The case aide testified that she informed appellant of the farewell visit and asked that appellant

bring clothes for the children, but appellant refused. Appellant did not attend the farewell visit.

Seymore testified that when she first started working with appellant in 2015, their communication was "great." However, appellant's communication dropped off in May 2015 and there were "long periods of silence throughout [the] case." Indeed, appellant agreed that she had virtually no contact with Seymore between May 2015 and December 2015. During the pendency of the case, appellant frequently moved between Minnesota and Nebraska. Prior to December 2015, appellant did not comply with any aspects of her case plan. Furthermore, appellant failed to keep the county apprised of her address, despite court orders directing her to inform the county of any address changes. Appellant's frequent moves interfered with her ability to access services. After trial started, Seymore began making referrals for a number of services because it was at that point that she and appellant resumed having ongoing contact.

During the trial, in early 2016, appellant underwent a parenting assessment and psychological evaluation. Appellant falsely reported to the evaluator that she obtained therapy for D.D.C. after he was sexually abused. The evaluator opined that appellant lacked empathy for exposing her children to domestic violence, instability and inconsistency in parenting, and physical abuse. The evaluator diagnosed appellant with posttraumatic stress disorder and alcohol use disorder and as having borderline and histrionic personality disorder features. The evaluator recommended that appellant address her mental health needs through long-term individual therapy. The evaluator also recommended that appellant receive psychiatric medication evaluation and treatment,

dialectical behavioral therapy skills training, anger management and skills training, and parenting education and skills training. The evaluator opined that "[t]he prognosis appears poor for [appellant] being able to meet her individual mental health needs and therefore being able to meet her child's growing needs and maintaining his safety in the near future." The evaluator opined that D.M.C. would be at risk of physical harm in appellant's care if she did not receive the recommended services.

On the first day of trial, December 15, 2015, appellant testified that she had not used any drugs other than alcohol and marijuana in the previous six months. But, appellant's hair follicle sample tested positive for cocaine and oxycodone from the time period between late September 2015 and late December 2015. There is no evidence in the record suggesting that appellant had been prescribed oxycodone. After Seymore made a referral for random urinalysis (UA) testing, appellant had to submit to UA testing twice a week and she provided clean UAs.

Appellant's case plan required that she undergo counseling. Appellant initially testified that she had been meeting with a therapist named Michael Yow for approximately a year, but later testified that her therapist's name was Michael Yar. Appellant was unable to provide an address for her therapist or explain how she paid for the sessions.

After considering this evidence, the district court filed an order terminating appellant's parental rights to D.M.C. As of the date of the district court's order, D.M.C. had been in out-of-home placement for a total of 872 days, well beyond the permanency deadline established by Minnesota law. *See* Minn. Stat. § 260C.503 (2014) (providing that district court must commence permanency proceedings no later than 12 months after child

is placed in foster care).  The district court concluded that the county had proven by clear and convincing evidence that appellant's parental rights should be terminated on three separate statutory grounds: failure to comply with parental duties; palpable unfitness; and failure of reasonable efforts by the county to correct the conditions leading to out-of-home placement.  *See* Minn. Stat. § 260C.301, subd. 1(b)(2), (4), (5) (2014).  The district court also determined that termination of appellant's parental rights was in the best interests of D.M.C., the county made reasonable efforts to reunite D.M.C. with appellant, and the provision of further services to appellant to reunify her with D.M.C. "would be futile and unrealistic under the circumstances of this case."  This appeal followed.

### D E C I S I O N

Appellant argues that the district court abused its discretion by determining that the county made reasonable efforts to reunite the family.[2]  Courts presume that parents are fit to care for their children, and "[p]arental rights may be terminated only for grave and weighty reasons." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 87 (Minn. App. 2012) (quotation omitted).  The petitioning county has the burden of proving by clear and convincing evidence that the parent is unfit under at least one of the statutory grounds. *Id.*; *see* Minn. Stat. § 260C.317, subd. 1 (2014) (requiring clear and convincing evidence of statutory ground to terminate parental rights).

---

[2] Although appellant purports to challenge the district court's determination that there was a statutory ground for termination of her parental rights and the district court's conclusion that termination of appellant's parental rights is in the best interests of D.M.C., appellant's arguments are limited to her contention that the county failed to make reasonable efforts. Therefore, we only address appellant's argument that the county failed to make reasonable efforts.

8

A reviewing court "gives considerable deference to the district court's decision to terminate parental rights," but "closely inquire[s] into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). We give the district court's decision considerable discretion because the district court "is in a superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996). We review the district court's factual findings for clear error. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012). This court will affirm a district court's decision to terminate parental rights if at least one statutory ground is supported by clear and convincing evidence, termination is in the best interests of the child, and the county made reasonable efforts to reunite the family. *S.E.P.*, 744 N.W.2d at 385.

Minnesota law requires that a district court make "specific findings" in every termination proceeding "that reasonable efforts to finalize the permanency plan to reunify the child and the parent were made" or "that reasonable efforts for reunification [were] not required" as set forth in Minn. Stat. § 260.012 (2014). Minn. Stat. § 260C.301, subd. 8 (2014). The district court must make "individualized and explicit findings regarding the nature and extent of efforts made by the social services agency to rehabilitate the parent and reunite the family." *Id.*, subd. 8(1).

> When determining whether reasonable efforts have been made, the [district] court shall consider whether services to the child and family were:
>     (1) relevant to the safety and protection of the child;
>     (2) adequate to meet the needs of the child and family;

9

(3) culturally appropriate;
(4) available and accessible;
(5) consistent and timely; and
(6) realistic under the circumstances.

Minn. Stat. § 260.012(h). Alternatively, the district court may conclude that "provision of services or further services for the purpose of rehabilitation is futile and therefore unreasonable under the circumstances." *Id.*

"Reasonable efforts at rehabilitation are services that go beyond mere matters of form so as to include real, genuine assistance." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotations omitted), *review denied* (Minn. Mar. 28, 2007). Determining whether the county provided reasonable efforts requires consideration of the length of the county's involvement, the nature of the problems presented, and the quality of the effort given. *J.K.T.*, 814 N.W.2d at 88. We review a district court's finding that the county made reasonable efforts to reunite the family for clear error. *See J.R.B.*, 805 N.W.2d at 901. "A finding is clearly erroneous if it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Children of T.R.*, 750 N.W.2d 656, 660–61 (Minn. 2008) (quotation omitted).

We conclude that the district court's determination that the county made reasonable efforts to reunify appellant and D.M.C. is supported by clear and convincing evidence and does not constitute error. The county provided extensive services to appellant throughout her lengthy history with child protection. During her first involvement with child protection in 2008 to 2009, the county made a referral for a public health nurse and parenting education, provided appellant with in-home parenting, obtained a diagnostic

10

assessment for appellant, provided appellant with supplies to help her care for her children, and obtained special needs daycare for appellant's children. Child protection provided appellant with case plans for the children in 2013 to 2014, during her second involvement with child protection. The county also referred appellant to a parenting trainer, helped her secure housing, and coordinated with appellant's probation officer. Appellant attended and completed anger management and chemical dependency treatment and received individual therapy. The county made a referral to an agency for furniture during appellant's third involvement with child protection.

During appellant's fourth involvement, the county provided appellant with a case plan, which appellant signed on May 20, 2015. Among other things, the case plan included parenting education, a mental health assessment, anger management, counseling, a parenting assessment and chemical dependency assessments. Prior to the first court hearing in this case, a child protection worker met with appellant to discuss a visitation plan, the children's needs, and potential placements for the children. The county transported the two older children to visits with appellant and supervised the visits and arranged a farewell visit between the two older children, appellant, and D.M.C.

Appellant argues that the county did not provide her with any services during the first eight months of the current child protection case. First, we note that since the beginning of the child protection matter, appellant maintained that she is a good parent, she does not need services, and services will not improve her parenting skills. Indeed, during her parenting assessment and psychological evaluation, after the first day of trial, appellant denied that she needed services to help her with parenting issues.

11

Moreover, while the county did not provide any referrals to appellant before the first day of trial, appellant greatly impeded her ability to receive services from the county. According to Seymore, there were "long periods of silence" throughout the case, but communication picked up in December around the time the termination trial began. Seymore testified that she had difficulty contacting appellant by phone. The GAL testified that it generally took her two or three days to reach appellant by phone, appellant's phone number changed during the case, and she was only able to find out appellant's new phone number by making calls to appellant's family members.

Appellant moved and traveled back and forth between Minnesota and Nebraska during the case, but failed to keep Seymore apprised of her address, interfering with her ability to receive services. Seymore testified that most of the time she was not sure where appellant was and that there were occasions when appellant stated that she was living in one state, when she was really living in another state. Seymore stated that there have been instances where she worked to provide services for appellant in one state only to learn that appellant has moved back to the other state and that appellant's "[m]oving back and forth made it impossible to provide services." Appellant's moves also interfered with her medical coverage, creating a barrier to her ability to access services.

Seymore began making referrals for appellant after the first day of trial because that was when she started to have ongoing contact with appellant. Seymore made referrals for random UAs, hair follicle testing, a chemical dependency assessment, a parenting assessment, and a psychological evaluation. Seymore and the GAL arranged a meeting with appellant in January 2016 to review the updated case plan. However, appellant

12

disputed whether her children were in need of services and began screaming at Seymore before storming out of the meeting.

During the proceedings, appellant failed to take advantage of the opportunity to visit D.M.C, despite the county's efforts to facilitate such visitation. Seymore testified that at first appellant did not communicate with Seymore or request any visits with D.M.C. Seymore testified that she later set up supervised visits for appellant with D.M.C. in Nebraska, but prior to the first visit, appellant returned to Minnesota. Though appellant's fiancé testified that appellant had been to Nebraska approximately half a dozen times during the three months between the first and third days of trial, appellant never told Seymore that she was visiting Nebraska and would like to visit D.M.C.

Appellant contends that she asked Seymore for guidance on case plan requirements on multiple occasions throughout the case, but Seymore responded by telling appellant that she did not know what appellant needed and that appellant would have to come up with her own services. Seymore testified that appellant came to her office in August 2015 and asked what she could do to get her children back. Seymore stated that she told appellant something to the effect of "You tell me what you need. I don't know what you need. I gave you what I thought you needed and that didn't work." Seymore testified that appellant then stormed out of her office and "cried and screamed down the hall talking about she's a good mom, that she [doesn't] abuse her kids." Seymore testified that she gave appellant a similar response when appellant came to Seymore in October 2015 asking what she could do to get her children back. Seymore clarified that her reference to efforts in the past referred to the services provided in the prior child protection matters and her efforts to

13

engage appellant in the case plan at the beginning of the fourth child protection matter. Seymore explained that she was looking for suggestions. Seymore testified, "[I]t's important for parents to be able to have a conversation about what they need, have some insight about where their deficiencies are. And then my role would be to find services that then fit into those deficiencies in order to create long-term behavior change." At this point, appellant had been provided with the case plan, had received extensive services in the prior child protection cases, but continued to demonstrate the same parenting deficiencies. Under these circumstances, Seymore's attempts to seek insight into what services would enable appellant to remedy her parenting deficiencies were reasonable.

Finally, appellant argues that this case is similar to *In re Children of T.R.* In *T.R.*, the county did not provide the noncustodial father a valid chemical dependency evaluation, despite his acknowledged drug and alcohol use, and did not offer the father chemical dependency treatment. 750 N.W.2d. at 666. Additionally, the county did not provide appellant with services to help the father to understand the proceedings, despite his lack of verbal skills and low average I.Q., and the county did not visit the home the father rented in order to comply with the case plan's requirement to obtain suitable housing. *Id.* After contrasting the substantial services the mother received with the services offered to the father and noting that no services were offered to address the father's lack of verbal skills and difficulty in understanding the proceedings, the Minnesota Supreme Court held that the county's efforts with regard to the father were not reasonable and reversed the termination of his parental rights. *Id.*

14

The facts of this case are distinguishable. Appellant received extensive services, including parenting education, therapy, chemical dependency treatment, and anger management services in prior child protection cases. In the child protection matter that led to the termination proceedings, the county provided appellant with a case plan that required appellant to undergo parenting education, a parenting assessment, a mental health assessment, anger management, and counseling. However, appellant's own actions impeded the county's ability to provide services, as appellant completely failed to engage with the case plan during the first eight months of the case, failed to keep in contact with Seymore, and moved back and forth between Minnesota and Nebraska. And, there is no indication in this case that appellant did not understand the termination proceedings.

Appellant argues that her case is like *T.R.* because the county did not make any referrals for services after receiving the results of her evaluations, specifically focusing on the recommendations of the parenting assessment and psychological evaluation report. Seymore made the referral for those services sometime after the first day of trial in December 2015. The evaluator met with appellant on three dates to complete these evaluations: January 12, 2016; January 19, 2016; and March 22, 2016. The written report was drafted on March 28. Seymore testified that she received the parenting assessment and psychological evaluation report approximately six to eight weeks before the final day of trial in May 2016. On March 28, appellant testified that she was planning on moving back to Nebraska the following day. Given the relatively late completion of the assessments, appellant's frequent moves and history of failure to keep the county apprised of her whereabouts, and Seymore's testimony that it takes longer to set up services out of

15

state, the county's failure to make further referrals for appellant in the last few weeks before the final day of trial is not unreasonable.

In conclusion, the record shows that the county provided appellant with extensive services in her three prior involvements with child protection. In the fourth child protection involvement, appellant failed to engage in the case plan until the first day of trial and the county's attempts to engage appellant in services were impeded by appellant's belief that she did not need services, her frequent moves between Minnesota and Nebraska, and her failure to keep in contact with the county. Under these circumstances, we cannot say that the district court's finding that further services would be futile and unrealistic is clearly erroneous. We conclude that the district court's determination that the county made reasonable efforts to reunify appellant and D.M.C. is supported by clear and convincing evidence and does not constitute error.

**Affirmed.**