*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1149**

In the Matter of the Welfare of the Child of: M. A. C., Parent.

**Filed January 29, 2024**
**Reversed and remanded**
**Larson, Judge**

Hennepin County District Court
File No. 27-JV-22-2531

Brooke Beskau Warg, Hennepin County Adult Representation Services, Minneapolis, Minnesota (for appellant-mother M.A.C.)

Mary F. Moriarty, Hennepin County Attorney, Britta Nicholson, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services and Public Health Department)

Maureen Menikheim, Minneapolis, Minnesota (guardian ad litem)

B.J., Eagan, Minnesota (self-represented respondent-father)

        Considered and decided by Larson, Presiding Judge; Cochran, Judge; and Slieter, Judge.

**NONPRECEDENTIAL OPINION**

**LARSON**, Judge

        On appeal from the termination of appellant-mother M.A.C.'s parental rights, mother argues that the district court abused its discretion when it determined respondent Hennepin County Human Services and Public Health Department (the county) made reasonable efforts to reunite the family. We reverse and remand.

**FACTS**

Mother is the biological mother of child, F.R.C.[1] The child in need of protection or services (CHIPS) case began upon child's birth on February 26, 2021. The county received a neglect report due to child's prenatal exposure to drugs and mother's prior termination of parental rights (TPR) to another child.[2] Mother tested positive for amphetamine, and child tested positive for methamphetamine at birth. Child was treated in the neonatal-intensive-care unit for respiratory distress, prenatal drug exposure, and feeding difficulties. Upon discharge, the county allowed child to leave with mother to the home that mother shared with her parents (child's grandparents) under a safety plan. The safety plan provided that grandparents would help care for child, and mother would submit to drug testing and treatment.

After mother failed to verify her sobriety for seven months, the county filed a CHIPS petition on October 1, 2021. The petition alleged that child was CHIPS based on her prenatal exposure to drugs and mother's failure to demonstrate sobriety. The county did not request out-of-home placement and permitted child to remain with mother under protective supervision on the condition that mother demonstrate sobriety through urinalysis (UA) or a sweat patch.

At a hearing on January 4, 2022, the district court adjudicated child CHIPS. The county requested out-of-home placement based on testimony from a social worker that

---

[1] Mother was child's sole custodian under Minn. Stat. § 257.541, subd. 1 (2022). Child's father is not involved in this appeal.

[2] In 2005, the district court voluntarily terminated mother's parental rights to another child. *See* Minn. Stat. § 260C.301, subd. 1(a) (2022).

mother had not demonstrated sobriety, and the county could not ensure child's safety. The district court reserved its decision, giving mother 24 hours to complete a UA and telling the county to file a motion for immediate custody should she fail to do so. On January 5, 2022, mother made four attempts to submit a UA but failed to produce a testable sample. Because mother failed to demonstrate sobriety, on January 7, 2022, the district court ordered the county to take immediate custody of child. Child was placed in foster care, and mother was ordered to comply with and complete her case plan. The court-ordered case plan required mother to "demonstrate sobriety by submitting UAs at HCMC or [a] sweat patch through Minnesota Monitoring," and "[u]pon positive UA, positive sweat patch, or *any other indication of chemical use*, . . . complete a Rule 25 chemical health assessment and follow all recommendations." (Emphasis added.)

On October 6, 2022, the county filed a TPR petition on three statutory grounds, including that: (1) mother "substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed . . . by the parent and child relationship"; (2) mother "is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct"; and (3) "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." *See* Minn. Stat. § 260C.301, subd. 1(b)(2), (4), and (5) (2022).[3] The county relied almost exclusively on mother's chemical-dependency history

---

[3] The county raised an additional ground in the petition that only applied to child's father. *See* Minn. Stat. § 260C.301, subd. 1(b)(7) (2022). Because this appeal relates only to mother, this ground is not relevant here.

and failure to demonstrate sobriety through testing. At the admit/deny hearing on October 17, 2022, mother entered a denial, and the district court scheduled a trial.

The district court held a trial on May 2-4, 2023. The district court heard testimony from a child-protection social worker, child's foster parent, a drug-testing coordinator, mother, and child's guardian ad litem (GAL).

The social worker testified that she first became involved with the case in June 2021. Prior to removal, child appeared healthy when she was with mother. But the social worker remained concerned about child's safety due to her age, inability to advocate for herself, and mother's noncompliance with testing. Throughout her involvement with the case, the social worker testified that mother had consistent opportunities to demonstrate sobriety, but mother failed to do so. The social worker suspected mother was using methamphetamine during some of their interactions. The social worker knew mother was engaging with private services from Nystrom and Associates, who provide mental-health and chemical-dependency services, along with individual therapy. In August 2022, mother completed an assessment with Nystrom and Associates, but the county did not receive the results until April 2023.

After child's removal, the social worker implemented a visitation schedule, but mother had limited engagement with case planning and visitation. The social worker also stated that, when communication or transportation were an obstacle for mother, the county provided her with phone minutes, gas money, or a public-transportation pass.

The drug-testing coordinator testified about how sweat patches are applied and tested. The drug-testing coordinator testified that after each of the multiple referrals from

4

the county, Minnesota Monitoring contacted mother but she did not respond. Mother eventually had a sweat patch applied on three occasions, but she never returned for sweat patch removal.

Mother also testified. She admitted that she had used methamphetamine since 2004-2005. Though she did not admit to specific crimes, mother agreed that her drug use "has brought [her] into the criminal justice system" in three counties. She acknowledged that her addiction led her to voluntarily terminate her parental rights to another child, which the record shows occurred in 2005. And she noted that she has not completed chemical-dependency treatment since child's birth.

Mother denied knowing that child's meconium tested positive for methamphetamine after birth, but she acknowledged the county requested she demonstrate sobriety with UAs or sweat patches. She provided a viable sample for only one UA between February 2021, when child was born, and April 2023, and it was positive for methamphetamine.

Mother testified that she never discussed or made a case plan with the social worker and that she did not understand the case plan the county provided for her. Mother recognized that the district court discussed her case plan during her thirteen hearings, though all parts of it might not have been addressed during each hearing. She understood that her case plan required her to demonstrate sobriety.

Mother also testified that "no one ever directed her to access mental-health support or attend a diagnostic assessment." Mother recalled referring herself to Nystrom and Associates for a chemical-dependency assessment. Mother stated that she told the social

5

worker that she completed the assessment and signed a release to give the results to the social worker. She also stated that about a month before trial, she completed a diagnostic mental-health assessment, but the recommendations were not finished by the time of trial. Mother testified that she planned to start therapy in roughly two weeks.

The GAL testified in support of the TPR. The GAL was assigned to child in 2021. The GAL testified that mother failed to comply with her case plan. The GAL stated that, due to her positive UA on April 7, 2023, there was evidence mother continued to use methamphetamine, which "prevents [mother] from safely and suitably caring for [child]."

On June 15, 2023, the district court issued its findings of fact and conclusions of law, involuntarily terminating mother's parental rights to child. As relevant here, the district court determined that the county made reasonable efforts to reunify mother and child. The district court also found that the county provided mother with chemical-health services, mental-health services, family group conferencing, safety plans, visitation, and financial assistance for her phone and transportation. Moreover, the district court concluded that the county made referrals for UAs and sweat-patch testing, and mother only completed one UA, which was positive, three weeks before trial.

On July 15, 2023, mother filed a posttrial motion seeking amended findings and a new trial. The district court denied mother's motion for a new trial and amended findings. Mother appeals from the orders terminating her parental rights and denying her motion for a new trial and amended findings.

**DECISION**

"Parental rights are terminated only for grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990). Whether to terminate parental rights is within the district court's discretion. *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136 (Minn. 2014). We will affirm the district court's decision to terminate parental rights when: the county made reasonable efforts toward reunification, at least one statutory condition supports termination, and termination is in the child's best interests. *In re Welfare of Child of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). Here, mother challenges the district court's decision that the county proved by clear and convincing evidence that it made reasonable efforts to correct the condition leading to child's out-of-home placement; specifically, her documented chemical dependency. *See id.* (articulating the clear-and-convincing-evidence standard).

The district court may terminate parental rights if "reasonable efforts, under the discretion of the court, have failed to correct the conditions leading to the child's placement." Minn. Stat. § 260C.301, subd. 1(b)(5). "Reasonable efforts . . . are services that go beyond mere matters of form so as to include real, genuine assistance." *In re Welfare of Child of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotation omitted), *rev. denied* (Minn. Mar. 28, 2007). In determining whether the county's efforts were reasonable, a court should consider whether the services provided were: (1) "selected in collaboration with the child's family and, if appropriate, the child"; (2) "tailored to the individualized needs of the child and child's family"; (3) "relevant to the safety, protection, and well-being of the child"; (4) "adequate to meet the individualized needs of the child

and family"; (5) "culturally appropriate"; (6) "available and accessible"; (7) "consistent and timely"; and (8) "realistic under the circumstances." Minn. Stat. § 260.012(h) (2022). Whether the county made reasonable efforts is a factual finding we review for clear error. *See S.E.P.*, 744 N.W.2d at 387. We give "[c]onsiderable deference" to the district court's decision due to its "superior position to assess the credibility of witnesses." *In re Welfare of Child of S.S.W.*, 767 N.W.2d 723, 733 (Minn. App. 2009) (quotation omitted).

Mother argues the department failed to make reasonable efforts because it only provided her referrals for chemical testing and never referred her for a Rule 25 chemical-health assessment. Mother asserts that, because the county relied almost exclusively on her chemical dependency as the basis for terminating her parental rights, only providing chemical testing was not enough to satisfy the reasonable-efforts standard. Under the specific facts in this case, we agree that the county failed to make reasonable efforts.

Here, mother's case plan required, among other things, that she "demonstrate sobriety by submitting UAs at HCMC or the sweat patch through Minnesota [Monitoring]." The district court ordered that "[u]pon positive UA, positive sweat patch, *or any other indication of chemical use*, [mother would] complete a Rule 25 chemical health assessment and follow all recommendations." (Emphasis added.) The record shows that, over the course of the CHIPS and TPR cases, the county had numerous "indication[s] of chemical use," including: (1) mother admitted that three weeks before child's birth she used methamphetamine; (2) mother tested positive for amphetamine at the time of child's birth; (3) the county removed child from the home because it treated mother's failure to test as positive test results; (4) mother repeatedly failed to test, which the county treated as

8

positive test results; and (5) one month before trial mother tested positive for methamphetamine and amphetamine. This is precisely the evidence the county relied on at the TPR trial to meet the statutory conditions to support termination. Yet, the county never made a referral for a Rule 25 chemical-health assessment as the district court ordered.

The county does not dispute that it did not provide a referral for a Rule 25 chemical-health assessment. Instead, the county asks us to adopt a rigid analysis for determining when a county must make a referral for a Rule 25 chemical-health assessment. Specifically, the county asserts that it does not have an obligation to make a referral for a Rule 25 chemical-health assessment until the parent has a positive test. We decline to adopt this rigid rule, as it does not comport with the legislature's direction that reasonable efforts should be "tailored to the individualized needs of the child and the child's family." Minn. Stat. § 260.012(h)(2); *see also In re Welfare of S.Z.*, 547 N.W.2d 886, 892 (Minn. 1996) (holding "[t]he nature of the services which constitute 'reasonable efforts' depends on the problem presented"). Further, the county's request is directly at odds with the court-ordered case plan in this case, which required mother to complete a Rule 25 chemical-health assessment if there was "*any . . . indication of chemical use.*" (Emphasis added.)

The county further argues that we should apply *In re Welfare of Child of C.L.H.*, No. A18-1167, 2018 WL 6596296 (Minn. App. Dec. 17, 2018), *rev. denied* (Minn. Jan. 29, 2019),[4] and conclude the county did not need to provide a Rule 25 chemical-health assessment because the county's "efforts were thwarted by [mother's] denial,

---

[4] We cite this nonprecedential case for its persuasive value. *See* Minn. R. Civ. App. P. 136.01(c).

9

minimization, and refusal to comply with drug testing." But *C.L.H.* is factually distinguishable. First, in *C.L.H.* the county referred the parent for a Rule 25 chemical-health assessment after one inconclusive test result. *Id.* at *2. Thus, *C.L.H.* directly cuts against the county's argument that it does not have sufficient information to make a referral for a Rule 25 chemical-health assessment until the parent has a positive test. Second, *C.L.H.* spoke to a county's obligation to provide *services*, not an initial Rule 25 chemical-health *assessment*. *Id.* at *3. The county has failed to cite, and we have been unable to find, a case that terminated parental rights based on a parent's chemical dependency when the county did not refer the parent for a Rule 25 chemical-health assessment. And this makes sense, given that it places a district court in the contradictory position of finding there was insufficient evidence to warrant a Rule 25 chemical-health assessment, but also clear and convincing evidence of chemical dependency to support termination.

This case is more akin to *In re Welfare of Child of T.R.*, 750 N.W.2d 656 (Minn. 2008). There, the court-ordered case plan required father to abstain from chemical use and complete a chemical-dependency assessment. *Id.* at 658. Thereafter, father had numerous positive test results and attempted to complete three chemical-dependency assessments. *Id.* at 660, 665-66. Yet the county refused to provide father any services related to his chemical dependency "without [father] completing the first step of demonstrating sobriety." *Id.* at 665. The supreme court reversed the district court's decision that the county made reasonable efforts because "simply testing for substance abuse, without more,

is not realistic under the circumstances to rehabilitate a parent who, that testing shows, suffers from chemical dependency issues." *Id.*[5]

Like in *T.R.*, mother's court-ordered case plan required mother to demonstrate sobriety and, if there was "*any . . . indication of chemical use,*" undergo a Rule 25 chemical-health assessment. (Emphasis added.) Despite the numerous indications of chemical use, set forth above, the county failed to even provide the initial referral for a Rule 25 chemical-health assessment. The county then relied on the very same indicators to support its TPR petition. Under these facts, it is unrealistic that "simply testing for substance abuse, without more" would rehabilitate mother, who clearly suffers from chemical dependency. *See id.*

In sum, the district court clearly erred when it found the county made reasonable efforts to reunify mother and child. Therefore, we reverse the district court's order terminating mother's parental rights. *See, e.g.*, *T.R.*, 750 N.W.2d at 666 & n.9; *In re Welfare of Child of A.D.B.*, 970 N.W.2d 725, 734 (Minn. App. 2022); *In re Welfare of Child of A.R.B.*, 906 N.W.2d 894, 900 (Minn. App. 2018). We remand to the district court to supervise child's juvenile-protection matter, including the county's provision of reasonable efforts to reunite the family. Because we reverse and remand based on the county's failure to employ reasonable efforts to reunify mother and child, we do not reach

---

[5] The supreme court also noted that counties may not decide independently that "efforts are futile." *T.R.*, 750 N.W.2d at 665-66. Instead, the county must seek a court determination that reasonable efforts to reunify the parent and child are no longer required. *See* Minn. Stat. § 260.012(a) (2022). Until that time, "the statute requires the county to continue to provide services to the parent." *T.R.*, 750 N.W.2d at 666.

11

mother's arguments about the statutory grounds supporting the termination or best interests.  Nothing in this opinion shall be construed as an expression of our opinion on how the district court should resolve any future requests for relief.

**Reversed and remanded.**